The CRONITE CO., Inc.

v.

UNITED STATES (W. E. Sellers, Doing Business Under the Name of John Sellers & Sons, Party in Interest).

C. D. 1847,

Protest Nos. 241476–K, 242411–K.

United States Customs Court,
Second Division.
Feb. 19, 1957.

Sharretts, Paley & Carter, New York City (Joseph F. Donohue, New York City, of counsel), for plaintiff.

George Cochran Doub, Asst. Atty. Gen. (Richard E. FitzGibbon and Richard H. Welsh, Trial Attys., New York City), for defendant.

Barnes, Richardson & Colburn, New York City (Joseph Schwartz, New York City, of counsel), for the party in interest.

Before LAWRENCE, RAO and FORD, Judges.

LAWRENCE, Judge.

This cause of action arose pursuant to the provisions of section 516(b) of the Tariff Act of 1930 (19 U.S.C. § 1516(b)), as amended by the Customs Administrative Act of 1938 (52 Stat. 1077), and Public Law 773, 80th Congress (62 Stat. 869, 19 U.S.C.A. § 1516(b)), which granted to manufacturers, producers, or wholesalers the privilege of challenging by protest the classification of and the rate of duty imposed upon imported merchandise of a class or kind "manufactured, produced, or sold at wholesale by him."

Two protests were filed by plaintiff against the liquidations by the collector

of customs at the port of New York, on certain importations, invoiced as steel plates, 24 inches long, ½ inch thick, and ¾ to 3¼ inches wide. The protests were consolidated for trial over the objection of the party in interest.

Section 516(b), as amended, is here set forth in full.

"[SEC. 516] (b) CLASSIFICATION. —The· Secretary of the Treasury shall, upon written request by an American manufacturer, producer, or wholesaler, furnish the classification of, and the rate of duty, if any, imposed upon, designated imported merchandise of a class or kind manufactured, produced, or sold at wholesale by him. If such manufacturer, producer, or wholesaler believes that the proper rate of duty is not being assessed, he may file a complaint with the Secretary, setting forth a description of the merchandise, the classification, and the rate or rates of duty he believes proper, and the reasons for his belief. If the Secretary decides that the classification of, or rate of duty assessed upon, the merchandise is not correct, he shall notify the collectors as to the proper classification and rate of duty and shall so inform the complainant, and such rate of duty shall be assessed upon all such merchandise entered for consumption or withdrawn from warehouse for consumption after thirty days after the date such notice to the collectors is published in the weekly Treasury Decisions. If the Secretary decides that the classification and rate of duty are correct, he shall so inform the complainant. If dissatisfied with the decision of the Secretary, the complainant may file with the Secretary, not later than thirty days after the date of such decision, notice that he desires to protest the classification of, or rate of duty assessed upon, the merchandise. Upon receipt of such notice from the complainant, the Secretary shall cause publication to be made of his decision as to the proper classification and rate of duty and of the complainant's desire to protest, and shall thereafter furnish the complainant with such information as to the entries and consignees of such merchandise, entered after the publication of the decision of the Secretary at the port of entry designated by the complainant in his notice of desire to protest, as will enable the complainant to protest the classification of, or rate of duty imposed upon, such merchandise in the liquidation of such an entry at such port. The Secretary shall direct the collector at such port to notify such complainant immediately when the first of such entries is liquidated. Within thirty days after the date of mailing to the complainant of notice of such liquidation, the complainant may file with the collector at such port a protest in writing setting forth a description of the merchandise and the classification and rate of duty he believes proper. Notwithstanding such protest is filed, merchandise of the character covered by the published decision of the Secretary, when entered for consumption or withdrawn from warehouse for consumption on or before the date of publication of a decision of the United States Customs Court or of the United States Court of Customs and Patent Appeals, rendered under the provisions of subsection (c) of this section, not in harmony with the published decision of the Secretary, shall be classified and the entries liquidated in accordance with such decision of the Secretary, and, except as otherwise provided in this chapter, the liquidations of such entries shall be final and conclusive upon all parties. If the protest of the complainant is sustained in whole or in part by a decision of the United States Customs Court or of the United States Court of Customs and Patent Ap-

peals, merchandise of the character covered by the published decision of the Secretary, which is entered for consumption or withdrawn from warehouse for consumption after the date of publication of such court decision, shall be subject to classification and assessment of duty in accordance with the final judicial decision on the complainant's protest, and the liquidation of entries covering such merchandise so entered or withdrawn shall be suspended until final disposition is made of such protest, whereupon such entries shall be liquidated, or if necessary, reliquidated in accordance with such final decision."

For convenient reference, the following data are deemed important:

| Protest No. | Entry No. | Entry date | Liquidated date | Protest filed |
|---|---|---|---|---|
| 241476–K | 715864 | 8/ 2/54 | 10/22/54 | 11/16/54 |
| 242411–K | 905188 | 6/21/54 | 11/ 8/54 | 12/ 2/54 |

As an aid to a clearer understanding of the case, it is deemed essential also to quote in full the proceedings described in 89 Treas. Dec. 54, T.D. 53454, which set forth the decision of the Treasury Department upon the complaint of the domestic manufacturer (The Cronite Co., Inc., plaintiff herein), pursuant to section 516(b), as amended:

"(T. D. 53454)
*"Engravers' steel*

"Approval of practice of assessing duty at the rate of 1¼ cents per pound under paragraph 309, Tariff Act of 1930, on engravers' steel ½ inch thick. Complaint of domestic manufacturer under section 516(b), Tariff Act of 1930, as amended

"TREASURY DEPARTMENT,
"OFFICE OF THE COMMISSIONER
OF CUSTOMS,

*"Washington, D. C., March 17, 1954.*
"To Collectors of Customs and Others Concerned:

"Under date of January 26, 1954, the Cronite Co., Inc., an American manufacturer having its principal place of business at North Bergen, New Jersey, through its attorneys, Sharretts, Paley & Carter, New York 4, N. Y., presented a request pursuant to section 516(b), Tariff Act of 1930, as amended (19 U.S.C. 1516 (b) [19 U.S.C.A. § 1516(b)]), for information relative to the tariff classification of certain engravers' steel. The Bureau replied in a letter dated February 1, 1954, that it was the practice to classify ½ inch engravers' steel as plates of steel, polished, by whatever name designated, under paragraph 309, Tariff Act of 1930 [19 U.S.C.A. § 1001], with duty at the rate of 1¼ cents per pound.

"Following the procedure outlined in section 516(b) of the tariff act, as amended, the attorneys filed a complaint dated February 8, 1954, *claiming that ½ inch engravers' steel was properly classifiable* as articles or wares, not specially provided for, composed wholly or in chief value of steel, *under the provisions of paragraph 397, Tariff Act of 1930,* as modified, with duty at the rate of 22½ percent ad valorem, *or as steel bars under paragraph 304, Tariff Act of 1930,* and chargeable with duties at the appropriated rates as such, *together with additional duties under paragraph 315 as such bars are cold rolled or polished.* [Italics supplied.]

"Engravers' steel has been the subject of several court decisions dating back to 1906. T.D.'s 27684, 28852, 29521, and 29616. T.D. 29521 (17 Treas.Dec. 101) holding polished steel plates intended to be engraved classifiable as plates under paragraph 135, Tariff Act of 1897,

was a decision of the United States Circuit Court of Appeals, Second Circuit, adverse to the Government. The court's decision was acquiesced in by the Treasury Department in a ruling published as T.D. 29533 (17 Treas.Dec. 113).

"Thereafter, engravers' steel was classified as polished plates under the Tariff Acts of 1909, 1913, 1922, and 1930, until 1939, when it was classified by the collector at New York as sheets and plates of steel under paragraph 304. This action was protested and the issue came before the United States Customs Court and was passed upon in a decision published as Abstract No. 43170 (4 Cust.Ct.Rpts. 388). From the evidence before it, the court found that the steel plates in question were polished on one side and sustained the claim that the merchandise was classifiable as plates, polished, under paragraph 309, Tariff Act of 1930.

"In view of the foregoing, the Bureau approves the present practice of classifying articles of the above-described character as plates of steel, polished, under paragraph 309, Tariff Act of 1930, with duty at the rate of 1¼ cents per pound. The Cronite Company has been so advised.

"In accordance with the provisions of section 516(b) of the tariff act, as amended, notice is hereby given that the classification of and the rate of duty on ½ inch engravers' steel, entered or withdrawn from warehouse for consumption after 30 days from the date of the publication of this letter in the weekly Treasury Decisions, will be subject to the decision of the United States Customs Court in the event that a protest is filed under the provisions of that subsection.

"(422.32)

"[Sgd.]   D. B. Strubinger,
"*Acting Commissioner of Customs.*"

The subject merchandise, invoiced as steel plates, was classified by the collector of customs in paragraph 309 of the Tariff Act of 1930 (19 U.S.C. § 1001, par. 309), 19 U.S.C.A. § 1001, par. 309, which provides, so far as pertinent here, for " * * * sheets and plates of iron or steel, polished, planished, or glanced, *by whatever name designated*, 1¼ cents per pound: * * *" [italics supplied].

By its protest (241476–K) which was filed November 16, 1954, as well as the second protest (242411–K) filed December 2, 1954, plaintiff invoked the following alternative claims for classification of the importations specifying rates of duty higher than the rate assessed by the collector:

1. Paragraph 397 as articles or wares, not specially provided for, manufactured wholly or in chief value of steel, at 22½ per centum ad valorem.

2. Paragraph 304 as die blocks or blanks, or as sheets and plates, not specially provided for, at the appropriate rates of duty according to value, together with additional duties in paragraph 315 applicable to steel bars which are cold rolled, cold drawn, cold hammered, or polished.

(The complaint, according to T.D. 53454, supra, did not make any claim for classification as die blocks or blanks, or sheets and plates, in paragraph 304. The complaint, however, did specify steel bars and that, as said bars, the articles should be "chargeable with duties at the appropriate rates as such, together with additional duties under paragraph 315 as such bars are *cold rolled or polished*.") [Italics supplied.]

3. Paragraph 341 as steel plates, engraved or otherwise prepared for printing, at 12½ per centum ad valorem.

(It is noted that the complaint makes no reference to paragraph 341.)

At the trial, upon motion of the plaintiff, both protests were amended to embody the claim that the merchandise should be classified as "bars" in said paragraph 304 "at appropriate rates according to its value."

That the written motion to amend protest 241476–K was intended to include a claim for classification as bars, but specifies *"paragraph 314"* of the Tariff Act of 1930 which does not enumerate bars. We think it is obvious, however, that paragraph *304* was intended. This is borne out by the colloquy between counsel and the court at the start of the trial and from the further fact that said paragraph 314 is limited to hoop or band iron or steel. Furthermore, the claim in the protests that the merchandise should be subjected to "additional duties under paragraph 315 of the same act applicable to steel bars which are cold rolled, cold drawn, cold hammered or polished in any way in addition to the ordinary process," automatically relates back to provisions in paragraph 304 "That on all iron or steel bars and rods of whatever shape or section which are cold rolled, cold drawn, cold hammered, or polished in any way in addition to the ordinary process of hot rolling or hammering, there shall be paid one-eighth of 1 cent per pound in addition to the rates provided on bars or rods of whatever section or shape which are hot rolled."

Before proceeding to a consideration of the case on the merits, our attention has been invited by the party in interest to certain alleged jurisdictional defects in the pleadings.

It is contended that the second protest (242411–K) which was filed December 2, 1954, is void and should be dismissed. This claim is based primarily upon the contention that section 516(b) provides that "The Secretary shall direct the collector at such port to notify such complainant immediately when the first of such entries is liquidated." That phase of the statute, the party in interest asserts, had been complied with by the filing of protest 241476–K, thereby exhausting plaintiff's opportunity to secure relief as to merchandise of a "class or kind," which is the subject of this protest, until final decision by the customs court.

By reference to section 516(b), it will be observed that, among other things,

the complainant "may file a complaint with the Secretary, setting forth a description of the merchandise, the classification, and the rate or rates of duty he believes proper, and the reasons for his belief."

It appears from the decision of the Treasury Department, T.D. 53454, supra, that the complaint filed with the Secretary, pursuant to section 516(b), as amended, alleged that "½ inch engravers' steel was properly classifiable as articles or wares, not specially provided for, composed wholly or in chief value of steel, under the provisions of paragraph 397, Tariff Act of 1930, as modified, with duty at the rate of 22½ percent ad valorem, or as steel bars under paragraph 304, Tariff Act of 1930, and chargeable with duties at the appropriate rates as such, together with additional duties under paragraph 315 as such bars are cold rolled or polished."

The argument of the party in interest proceeds upon the principle that decisions of this court clearly hold that the requirements of the statute—section 516(b)—must be strictly complied with, citing Reed & Barton et al. v. United States, 63 Treas.Dec. 941, T.D. 46422; Porcelain Enamel Institute v. United States (Langlotz & Co., Inc., party in interest), 64 Treas.Dec. 478, T.D. 46713; American Manufacturing Co. v. United States (Burka Bagging Co., party in interest), 62 Treas.Dec. 305, T.D. 45924.

While those authorities interpreted provisions of section 516(b) prior to the amended form with which we are here concerned, nevertheless, the section, as amended, does not weaken the controlling effect of those decisions, which will be discussed infra.

Section 516, as enacted in the Tariff Act of September 21, 1922, 42 Stat. 858, was a distinct innovation in customs administration and judicial procedure. By section 516(b), Congress set up an extraordinary remedy whereby a manufacturer, producer, or wholesaler could initiate proceedings designed to increase the amount of tax or duty imposed upon certain imported merchandise.

Section 516(b) of the act of 1922 was reenacted as section 516(b) of the Tariff Act of 1930. By the passage of the so-called Trade Agreements Act, 48 Stat. 943, approved June 12, 1934, it was provided, among other things, that the provisions of section 516(b) of the Tariff Act of 1930 "shall not apply to any article with respect to the importation of which into the United States a foreign trade agreement has been concluded pursuant to this Act, or to any provision of any such agreement."

By section 9(a) of Public Law 50, June 16, 1951, 65 Stat. 72, the foregoing restriction was removed.

It will be noted that section 516(b), applicable here, contains a substantial change with respect to the treatment to be accorded entries of merchandise subsequent to the filing of the first protest. Prior to its amendment, said section provided for the suspension of all entries after the first protest was filed "pending the decision of the United States Customs Court upon such protest." Section 516(b) now provides that "Notwithstanding such protest is filed, merchandise of the character covered by the published decision of the Secretary, when entered for consumption or withdrawn from warehouse for consumption on or before the date of publication of a decision of the United States Customs Court or of the United States Court of Customs and Patent Appeals, rendered under the provisions of subsection (c) of this section, not in harmony with the published decision of the Secretary, shall be classified and the entries liquidated in accordance with such decision of the Secretary, * * *."

With this background, we shall address ourselves further to the question whether what has been referred to as the second protest (242411–K) presents a jurisdictional defect.

It will be observed that the portion of section 516(b) pertinent here expressly states that "The Secretary shall direct the collector at such port to notify such complainant immediately when the *first of such entries is liquidated*"; and further that "Within thirty days after the date of mailing to the complainant of notice of *such* liquidation, the complainant may file with the collector at such port a protest in writing setting forth a description of the merchandise and the classification and rate of duty he believes proper." [Italics supplied.]

In the circumstances of this case, we interpret the quoted language as limiting the complainant to the filing of but one protest and that it must be directed to the entry which was liquidated first.

The decisions to which our attention has been invited by the party in interest clearly indicate that said section 516(b) must be strictly construed.

In the Reed & Barton case, supra, it appears from the opinion of the court that one of the grounds asserted by counsel for the Government in the motion to dismiss the protest in that case was "that plaintiffs herein have failed to show that this protest was lodged against the *first* liquidation of an entry of such merchandise made after the expiration of 30 days after pulication of the decision of the Secretary." [Italics quoted.]

The court set forth an analysis of section 516(b) and, in paragraph 8 of the analysis, stated that "The Secretary shall direct the collector at the designated port to notify the complainant 'immediately upon the liquidation of the *first of such entries to be liquidated.*'" [Italics quoted.]

Commenting upon this quotation, the court observed:

"It will be noted from paragraph 8 of the above analysis, that there is no provision in section 516(b) for the collector to notify the complainant of any liquidations other than that of the 'first of such entries to be liquidated.' We find no provision in the section authorizing the collector to notify the complainant of all liquidations thereafter until one is reached upon which he chooses to file a protest."

It appears that the Government moved to dismiss the protest in that case on

several grounds, including the one referred to in the decision as paragraph "8."

The court then said:

"* * * If the contentions of the Government are sustained on one of these grounds, it is sufficient to defeat the jurisdiction of this court to entertain the instant protest, as section 516 is a grant of an extraordinary privilege which must be strictly construed against the grantee. Citing Zinberg v. United States, 16 Ct.Cust.App. 268, T.D. 42870; Swan & Finch v. United States, 190 U.S. 143 [23 S.Ct. 702, 47 L.Ed. 984]; Hannibal [& St. J.] R. Co. v. [Missouri River] Packet Co., 125 U.S. 260, [8 S.Ct. 874,] 31 L.Ed. 731; Blair v. Chicago, 201 U.S. 400, [26 S.Ct. 427,] 50 L.Ed. 801. In the last-cited case, Mr. Justice Day, delivering the majority opinion of the Supreme Court, stated with respect to legislative grants of special privileges:

"It is matter of common knowledge that grants of this character are usually prepared by those interested in them, and submitted to the legislature with a view to obtain from such bodies the most liberal grant of privileges which they are willing to give. This is one among many reasons why they are to be strictly construed." 201 U.S. 400, 471 [26 S.Ct. 427, 445].

The court concluded its opinion as follows:

"We are of the opinion that inasmuch as this protest is shown to have been lodged against an entry not contemplated by the provisions of the statute, it is unnecessary to consider further the question as to proper parties, or other grounds urged by the Government in support of its motion to dismiss."

We may add that an examination of the entry papers in both of the protests herein discloses that entry No. 715364 in protest 241476–K not only embraces all sizes of merchandise described therein as "Steel Plates" of ½-inch thickness which are included in entry No. 905188, protest 242411–K, but also includes certain sizes ½ inch thick which are not in entry No. 905188.

In view of the authorities above cited, we are of the opinion that the second protest (242411–K) was unauthorized by the statute and that our jurisdiction was not properly invoked by it. It follows, therefore, that said protest must be, and hereby is, dismissed.

We shall consider next the status of protest 241476–K, in which a motion to amend was granted over the objection of the party in interest. Specifically, said amendment reads as follows:

"It is further and alternatively claimed that said merchandise is dutiable under paragraph 314 [304], Tariff Act of 1930, as bars, at appropriate rates according to its value."

While it is true, as stated by the party in interest, that the authorities above referred to, as well as American Manufacturing Co. v. United States, supra, hold that the requirements of section 516(b) must be strictly complied with, we are of the opinion that plaintiff, by its complaint, did, in substance, comply with the external requirements of section 516(b) and that the court properly exercised its discretion in permitting an amendment to protest 241476–K in order to conform the protest claims to the complaint. The decision of the Treasury Department, T.D. 53454, supra, specifically states that the plaintiff herein filed a complaint, claiming, among other things "that ½ inch engravers' steel was properly classifiable * * * as steel bars under paragraph 304, Tariff Act of 1930, and chargeable with duties at the appropriate rates as such, together with additional duties under paragraph 315 as such bars are cold rolled or polished." The amendment, therefore, does not, in our judgment, circumvent the statute, but merely corrects a patent clerical error.

■ As to the claim in said protest 241476–K that the subject merchandise should alternatively be classified as steel plates engraved or otherwise prepared for printing, in paragraph 341 of the Tariff Act of 1930 (19 U.S.C. § 1001, par. 341, 19 U.S.C.A. § 1001, par. 341), as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas.Dec. 121, T.D. 52739, for which duty at the rate of 12½ per centum ad valorem is provided, we hold that it is invalid as not being within the scope of the complaint.

We now reach a consideration of the case on the merits.

Plaintiff contends, first that the imported articles are fabricated from bars by manufacturing operations which produce an article dedicated to the specific, exclusive use of engravers and, hence, should be classified as articles, wholly or in chief value of metal, and subjected to duty at the rate of 22½ per centum ad valorem in paragraph 397 of said act (19 U.S.C. § 1001, par. 397, 19 U.S.C.A. § 1001, par. 397), as modified by the General Agreement on Tariffs and Trade, 82 Treas.Dec. 305, T.D. 51802.

If, however, this claim should be held to be untenable, it is contended, alternatively, that the imported articles are known, both commonly and commercially, as bars and not as plates, and subject to classification in paragraph 304 of said act (19 U.S.C. § 1001, par. 304, 19 U.S.C.A. § 1001, par. 304) as bars, cold rolled or polished, and subject to the additional duty provided in paragraph 315 of said act (19 U.S.C. § 1001, par. 315, 19 U.S.C.A. § 1001, par. 315.)

The alternative claim that the merchandise falls within the terms of paragraph 341 of said act, as modified, as steel plates, prepared for printing, has been disposed of, supra, as not within the purview of the complaint.

At the trial, plaintiff introduced the following exhibits:

Exhibit 1, piece of steel 2½ inches wide, 5¾ inches long, and ½ inch thick, representing the imported merchandise, except as to length and width. As imported, the pieces were 24 inches long and varied in width from ¾ to 3¼ inches.

Exhibit 2, bar of steel, approximately 26 inches long, 3 inches wide, and ½ inch thick, illustrating the type of material from which merchandise like exhibit 1 is produced.

Exhibit 3, finished steel bar, 25 inches long, 2¼ inches wide, and ½ inch thick, produced by the plaintiff company.

Exhibit 4, similar to exhibit 3, except for the difference in width, being ¾ inch wide.

Exhibit 5, sample of steel material, 8 inches long, 1½ inches wide, and ½ inch thick, that illustrates polish but lack of smoothness.

Illustrative exhibit 6–A, sample of a product of the Sellers Co., processed in the same manner and to the same extent as exhibit 1, measuring 2¼ inches long, ¾ inch wide, and ½ inch thick.

Illustrative exhibit 6–B, witness Gillis' sample, 5¾ inches long, 2¼ inches wide, and ½ inch thick, also processed in like manner and to the same extent as exhibit 1.

Exhibit 7, illustrating engravers' steel, not polished, approximately 8 inches long, 1½ inches wide, and ½ inch thick.

Exhibit 8, piece of veneer thickness of steel, 18 gage, 4½ inches long, and 3½ inches wide.

Exhibit 9, catalog or price list (1934) of the Harold M. Pitman Co., entitled "Pitman 'Hecla' Brand Engravers' Copper and Steel," indicating size of plates and bars offered for sale by that company.

Exhibit 10, pamphlet, entitled "Pitman Steel Dies and Bars—Copper and Steel Plates for Engraving," published and circulated in 1947, indicating the same sizes used by the Harold M. Pitman Co. since and prior to 1930, together with prices of plates, dies, bars and strips.

Exhibit 11, price list (1928) of the American Steel & Copper Plate Co., entitled "Engravers Embossers Steel and Brass Dies Copper and Steel Plates," listing plates, dies, *et cetera,* of that company.

Exhibit 12, "Price List 1920 Philadelphia Steel and Copper Plate Co.," containing similar information as in exhibit 11.

Exhibit 13, "Price List of Steel Plates & Steel Dies," issued by John Sellers & Sons.

Exhibit 14, small handbook (671 pages), entitled "Useful Information for Business Men Mechanics and Engineers," published by Jones & Laughlin Steel Co., Pittsburgh, describing its various products.

The following exhibits were introduced by the party in interest:

Exhibit A, sample of steel plate, which had been prepared for printing, of dimensions approximately 6 inches long, 2¼ inches wide, and ½ inch thick.

Collective Exhibit B, the record in protests 8339–K, etc. (decided in W. E. Sellers v. United States, 4 Cust.Ct. 388, Abstract 43170), together with exhibit 1 in that case, measuring 15½ inches long, 9 inches wide, and three-sixteenths of 1 inch thick.

It is not disputed that the merchandise represented by exhibit 1 herein is produced from a bar of steel 26 inches long, 3 inches wide, and ½ inch thick, represented by exhibit 2. Based largely upon this premise, plaintiff contends that "The imported articles are manufactured from bars, by manufacturing operations which produce an article dedicated to the specific exclusive use of engravers. Such articles are classifiable under paragraph 397."

In support of this contention, plaintiff invites our attention to the following authorities: Tide Water Oil Co. v. United States, 171 U.S. 210, 18 S.Ct. 837, 43 L.Ed. 139, and Anheuser-Busch Brewing Association v. United States, 207 U.S. 556, 28 S.Ct. 204, 52 L.Ed. 336; citing also Ishimitsu v. United States, 11 Ct.Cust.App. 186, T.D. 38963, and authorities referred to therein.

The foregoing authorities, in substance, laid down rule that to constitute a manufacture there must be "a transformation, a new and different article must emerge having a distinctive name, character, or use." That doctrine is so well established as to require no comment. However, as will be shown *infra,* from the evidence before us, we are satisfied that the imported items have not lost their identity as bars, although they are in an advanced stage of manufacture.

While it can scarcely be gainsaid that the importation is, in fact, literally within the terms of paragraph 397 as an article of metal, whether partly or wholly manufactured, it is doubtless true that the great majority of items enumerated in the metal schedule is within the literal terms of paragraph 397. However, that being a so-called catchall provision, it must, of course, yield to other more specific provisions, if any, of the metal schedule.

This brings us to a consideration of the alternative claim of plaintiff that if the subject merchandise is not within the provisions of paragraph 397 for dutiable purposes, it is then subject to classification in paragraph 304 of said act, and the testimony of all of the witnesses was directed in large measure to establishing that the imported commodity was commonly and commercially known as bars, as distinguished from plates.

Plaintiff's first witness, Edmund A. Gillis, vice president and general manager of the plaintiff company, with which he had been associated since 1933, testified that his concern manufactured merchandise like exhibit 1 (illustrating the imported article); that exhibit 2 is a hot-rolled piece of steel (or bar) illustrative of the raw material from which a product like exhibit 1 is fabricated.

Gillis explained in great detail the various steps employed in converting an

article like exhibit 2 into one like exhibit 1 by removing the scales, dirt, flaws, grinding the edges, and various finishing processes with the use of walrus-hide and abrasive, power-driven wheels and other refining processes in order to produce a bar with a top face of greatest possible smoothness. The witness testified that articles, such as exhibit 1, are imported in lengths of 24 inches and sold to engravers for use as dies in connection with the printing of engraved stationery. However, prior to use, they are cut to the size of the die to be used. The engraver then cuts or etches lettering or designs on the smooth surface of the bar which is then locked in a die-stamping press.

Although Gillis' experience as a salesman apparently began in 1933, he testified that the imported commodity is sold only to the engraving trade and is known as a bar; that the term "bar," as used in the engraving industry, has a definite and uniform meaning which is general throughout the trade of the United States. The term implies a piece of steel ½ inch thick, 24 inches long, and in widths ranging from ½ inch to 6 inches in increments of ¼ inch, prepared for use in engraving; that exhibit 1 is such an article as is sold in the trade as a bar.

He also testified that the term "plate," as understood in his trade, refers to a rectangular piece of steel, suitably prepared as to condition and size for engravers' use, but is ¼ inch or less in thickness.

With respect to the finish of exhibit 1, witness Gillis testified:

"* * * We don't care too much about polish in the sense of being reflective or visually pleasant. We are after smoothness. If in the attaining of smoothness we incidentally obtain a luster, it is of no great importance. We are after the smoothness to remove the fine underlying marks which might be present. * * *"

On cross-examination, Gillis, adhering to his distinction between a bar and a plate, testified that exhibit 1 is smooth, but not polished, and that, to prepare the imported product, which is 24 inches in length, for engraving, the bars have to be cut to size and then burred to insure square surfaces.

The following witnesses were also called by plaintiff:

David Lowell, president of the Imperial Engraving Co., Inc., testified that he had been engaged in the engraving business some 48 years. For the past 25 or 30 years, he had done all of the purchasing for his company. In fact, he was so engaged prior to June 1930.

Franklin E. Miller, president of the Miller-Northern Corp., manufacturer of engraved stationery since 1942, testified that, prior to that period, he was sole owner of the Franklin E. Miller Co., also manufacturer of engraved stationery since 1925. He also testified to his familiarity with merchandise, represented by exhibits 3 and 4, and to the trade meaning of the terms "plate" and "bar" prior to 1930.

John F. Klarmann, doing business under that name and engaged in the engraving business 30 years, during which time he was sole owner of the firm and purchased articles known as steel bars and steel plates prior to June 1930.

Joseph Rice, presently office manager of the Harold Pitman Co., supplier to photo-engravers, engravers and offset houses, with 38 years' experience. He testified that in and prior to 1930, he received orders for merchandise known as steel plates and bars and that the terms "plate" and "bar" had definite and uniform trade meanings throughout the trade.

At this point, it was stipulated that Wagner Clark, owner of the Clark Engraving Co., had been in the engraving business for the past 50 years and purchased merchandise like exhibits 1, 3, and 4; that he has purchased plates; and that, if he were asked the same questions on direct and cross-examination as were addressed to the witness.

Klarmann, he would give the same answers, extending his experience to the time he has indicated.

The witness Gillis was here recalled to testify that the principal markets wherein merchandise like exhibits 1, 3, and 4 is sold "would be Philadelphia, Chicago and New York City. * * * and the supply houses in Chicago, Philadelphia or New York ship to all of the other United States cities."

Robert N. Steffens, president of the plaintiff company since 1940, but associated with the company since 1929, testified that, in 1929, New York City was the principal market for merchandise like exhibits 1, 3, and 4; that other New York concerns, as well as those in Philadelphia, in Camden, and in Chicago, made shipments throughout the United States on orders which were mailed in to them.

Charles G. Seidell, salesman of about 40 years with Jones & Laughlin Steel Corp., selling steel throughout the United States. Prior to 1930, his experience in the trade was selling merchandise under the trade names of "bars" and "plates."

It was here stipulated by counsel that Harry F. DeLacour, district manager of the Vanadium Alloys Steel Co., New York City, seller of steel products generally throughout the United States, who was engaged in the sale of steel products, would, if interrogated on direct and cross-examination as was the previous witness Seidell, give the same answers, and "that the record may stand as if such questions and answers had been asked to Mr. DeLacour." There was one reservation to this agreement, however, that Mr. DeLacour had not made sales throughout the United States as had Mr. Seidell.

The witnesses introduced by plaintiff were men of long experience in the trade and had a broad and intimate knowledge of the classification of steel bars and plates. In view of the substantial unanimity of opinion of those witnesses, it is deemed unnecessary to set forth fully the evidence given by them. The weight of their testimony establishes without contradiction that merchandise, having the measurements (24 inches long, ½ inch thick, and ¾ inch to 3¼ inches wide) of the commodity here under consideration, was, at and prior to June 17, 1930, and has been up to the present time, known in the trade as bars and not as plates; that the term "bar" includes engravers' steel ½ inch thick, from ½ inch to 6 inches wide, and approximately 24 inches long, while the term "plate" applies to steel of certain surface dimensions, but varying in thickness from 1/16 inch to ¼ inch.

Bearing in mind that the principal markets for the steel engravers' supplies are New York, Philadelphia, and Chicago and that offices in those cities sell to engravers throughout the 48 States, we find that, by a great preponderence of the evidence, it is established that the importation in controversy is commercially known as a bar and not as a plate.

In addition to the testimony of plaintiff's witnesses, it is significant that the testimony of William E. Sellers, testifying for the party in interest, based upon more than 50 years' experience with engravers' steel, supports the foregoing conclusion, since he testified that the imported articles are generally known in the trade as bars and not as plates; that engravers' steel of ⅟₁₆ to ¼ inch thick is sold as a plate; and that it is customary to specify the thickness desired. It appears further from Sellers' testimony that merchandise like exhibit 1 is invoiced as a bar and that, in the catalogs and price lists published by the party in interest and circulated throughout the trade, such merchandise is described as steel bars.

As an aid to our understanding of the meaning of the term "plate," the following definitions are set forth:

Webster's New International Dictionary (1955)—

> "*plate, n.* * * * 1. A smooth, often nearly flat, and relatively thin, piece of any material, orig. only of metal; a thick sheet, slice, or la-

mina; esp., a perfectly flat sheet of material of uniform thickness throughout; as, the back *plate* of a watch, etc., a boiler or armor *plate*. 2. Metal in sheets, whether beaten, rolled, or cast. 3. A flat smooth piece of metal on or from which anything is, or is to be, engraved, molded, embossed, grained, deposited, or written; as, a name *plate*; specif., a piece of metal on which anything is engraved to be printed; hence, an impression from the engraved metal, or, loosely, from a wood cut * * *."

The Century Dictionary—

"*plate, n.* * * * 1. A sheet of metal of uniform thickness and even surface: as, a *plate* of gold; a steel *plate*. * * *"

Funk & Wagnalls New Standard Dictionary—

"*plate, n.* 1. A flat, extended, rigid body, as of metal, of slight thickness, especially when intended for attachment to another body, usually thicker, as the iron strips laid upon the track-beams of a tramway. * * *"

We find nothing in the definitions above quoted to dissuade us from our view that the subject merchandise is not within the common meaning of the term "plate."

It should be pointed out, however, that the testimony as to the commercial meaning of the term "bars" and "plates" was taken over the objection of the party in interest who contended that the structure of paragraph 309, supra, by express terms, rendered such testimony inapplicable, inasmuch as the said provision for sheets and plates was followed by the words "by whatever name designated."

Obviously, however, such argument cannot prevail unless a given commodity is, in fact, a sheet or a plate. In that event, it would be a matter of no consequence by what name it might be designated. In the case before us, however, we are satisfied that the imported commodity is not within the common meaning of the term "sheets" or "plates" and is not, in fact, a sheet or plate.

The testimony of plaintiff's witness Gillis establishes without contradiction that the subject merchandise is neither cold rolled nor polished; that the various processes to which it was subjected before importation imparted to the merchandise a smooth, as distinguished from a polished, surface.

As stated in plaintiff's brief:

"The imported bars unquestionably have a polished appearance, but that is incidental to processes that ground down the surface of the metal to produce a steel face of ultimate smoothness. * * *"

In view of the conclusion we have reached, we deem it unnecessary to consider the alternative claim for classification as die blocks or blanks in paragraph 304 as it is deemed to be without the orbit of the complaint.

One further point which must be examined before concluding this opinion is raised by the party in interest, namely, that the doctrine of legislative ratification of judicial construction is controlling. In support of that contention, it cites a series of decisions in which the importing firm was interested.

The earliest case to which our attention is invited is Wm. B. Sellers v. United States, 12 Treas.Dec. 448, T.D. 27684, decided October 30, 1906. It appears from the opinion in that case that the merchandise consisted of steel plates, intended to be engraved and used in the printing of steel engravings, and also so-called monogram dies, small plates on which monograms were to be engraved. They had been classified as articles in chief value of metal in paragraph 193 of the Tariff Act of 1897. They were claimed to be classifiable in paragraph 135 of said act as steel plates or as steel in forms and shapes. Other alternative paragraphs were invoked. The opinion further discloses that, of the two samples

admitted in that case, one was a "flat plate, 16½ by 9¾ inches, number 6 gage, with a highly polished surface and beveled edges; the other, the so-called die, a piece of polished steel,, 5 by 2 inches, one-half inch in thickness."

The following statement of the court is significant:

"This is an instance where the rate assessed by the collector and the rates alternatively claimed by the importer are severally inapplicable. The so-called dies are but steel in plates and have not been made into anything else; in the case of the others, the beveling of the edges has not advanced them beyond the status of steel plates, which they still retain. *  *  *"

Further, the court stated:

"Finally, it is manifest that a correct reliquidation in accordance with the terms of the protests could not be made. *  *  *"

In conclusion, the court held, upon the authority of United States v. Fleitmann, 2 Cir., 137 F. 476, T.D. 26118, and United States v. H. Bayersdorfer & Co., 3 Cir., 126 F. 732, T.D. 24923, that the protests were insufficient. They were, accordingly, overruled, permitting the decision of the collector to stand, although erroneous.

That case can scarcely be regarded as an authority in support of the primary claim of the party in interest that the present importation should be classified as a steel plate. One sample, as the court pointed out, was a flat plate, 16½ by 9¾ inches, number 6 gage, highly polished, with beveled edges; the other, a so-called die, a piece of polished steel, 5 by 2 inches in surface dimensions, ½ inch in thickness, where as the commodity involved in the present proceedings consists of pieces of steel 24 inches long, ¾ to 3¼ inches wide, and ½ inch thick. Moreover, the court, in the Sellers case, overruled the protests on the ground that they were insufficient and, hence, did not properly invoke the jurisdiction of the

court. Therefore, the real issue in that case was not decided.

The next Sellers case, cited by the party in interest, is W. B. Sellers v. United States, 13 Treas.Dec 927, T.D. 28300, Abstract No. 16013, decided June 26, 1907. The reported opinion recites:

"Protests sustained on the authority of G.A. 6472 (T.D. 27684), relating to engravers' plates."

On appeal, in United States v. W. B. Sellers, C.C., 160 F. 518 (also reported in 15 Treas.Dec. 265, T.D. 28852), the opinion of this court, then the Board of General Appraisers, was quoted in full in said T.D. 28852, from which it appears that the merchandise then before the court consisted of steel plates "of the same kind as those which were passed upon in G.A. 6472 (T.D. 27684) and therein held to be dutiable as claimed in the protests."

As above pointed out, however, the court, in said T.D. 27684, did not decide the issue before it, but overruled the protests because they were found to be "insufficient." The decision of the Court of Appeals for the Second Circuit, in United States v. Sellers, 166 F. 1022 (17 Treas.Dec. 101, T.D. 29521), affirmed the opinion of the circuit court.

In W. B. Sellers v. United States, 14 Treas.Dec. 71, T.D. 28351, Abstract No. 16236, decided July 16, 1907, and again in W. B. Sellers v. United States, 14 Treas.Dec. 80, Abstract No. 16307, decided July 19, 1907, the protests of W. B. Sellers were sustained on the authority of said T.D. 27684. The latter two Sellers cases, upon appeal, were affirmed by consent (17 Treas.Dec. 331, T.D. 29692).

Later, in W. B. Sellers v. United States, 17 Treas.Dec. 214, T.D. 29616, decided March 9, 1909, this court, then the Board of General Appraisers, described the merchandise there before it as "flat, thin plates of steel, with a highly polished surface and beveled edges, while others are so-called monogram dies, small plates of polished steel about one-half inch in thickness." It

768

was classified as articles of steel in paragraph 193 of the Tariff Act of 1897 and was claimed to be properly classifiable as steel plates and dutiable at the appropriate rates provided in paragraphs 135 and 141 of said act. Following earlier decisions, the protests were sustained.

The last of this series of cases to be cited by the party in interest is W. E. Sellers v. United States, 4 Cust.Ct. 388, Abstract 43170, decided January 31, 1940.

At the trial of that case, plaintiff, William E. Sellers, appeared without counsel and produced a sample of the merchandise there in question. It was received in evidence and marked "Plaintiff's Exhibit 1." It is in the present record as a part of collective exhibit B. Its dimensions are 15½ inches long, 9 inches wide, and three-sixteenths of 1 inch thick—one side being highly polished. An examination of the opinion of the court indicates that it was based largely upon the appearance of said exhibit 1. The opinion reads, in part:

"Inasmuch, however, as the sample in evidence indicates beyond question that the imported steel plates are polished on one side, and since counsel for the Government at the time of hearing so conceded, we hold as a matter of law, on the ground of relative specificity, that the instant polished steel plates are properly dutiable at the rate of 1¼ cents per pound under the eo nomine provision therefor in paragraph 309 of the Tariff Act of 1930, as alleged by the plaintiff."

It may be noted also that, whereas the witness Sellers testified that the merchandise in that case "was similar in all material respects to that involved in the case of United States v. Sellers, T.D. 29521, 17 Treas.Dec. 101," the court there held that the record in said T.D. 29521 was improperly incorporated, pointing out that the precise issues in the two cases were not the same, the classification in one case being as an article in chief value of metal, whereas, in the later Sellers case (Abstract 43170), the classification was "sheets and plates of steel not specially provided for; all the foregoing * * * valued above 16 cents per pound."

While the witness in the Sellers record, incorporated herein, testified that "sometimes this merchandise is imported in different sizes" varying "from ¾″ by ¾″ to 18″ by 24″, or maybe 18″ by 36″," it is not clear that any other dimensions, than those represented by exhibit 1 in that case, were then before the court, and the opinion in that case indicates that the record of an earlier case had been improperly incorporated. The opinion further indicates that the court was predicating its decision upon merchandise represented by said exhibit 1, which is materially different in dimensional qualifications from the subject merchandise herein.

The foregoing analysis of the various decisions in the Sellers cases leads us to the conclusion that the merchandise to which those cases related was not the same in essential dimensional factors nor in degree of manufacture to the subject merchandise herein. Consequently, the basic factual differences between the Sellers cases and the case at bar leave the present case unaffected by the earlier ones. Therefore, the doctrine of legislative approval of judicial construction does not apply and cannot be properly invoked herein.

Upon the record before us and for the foregoing reasons, we find and hold that the items invoiced as steel plates, ½ inch thick, ¾ to 3¼ inches wide, and 24 inches long, are properly classifiable as bars, neither cold rolled nor polished, of the kind enumerated in paragraph 304 of the Tariff Act of 1930 and dutiable at the appropriate rates provided therein.

That claim in protest 241476–K is sustained.

Judgment will issue in accordance with the views herein expressed.