DOWNS v. UNITED STATES.

(Circuit Court of Appeals, Fourth Circuit. February 4, 1902.)

No. 430.

1. CUSTOMS DUTIES — COUNTERVAILING DUTY — BOUNTY OR GRANT ON EXPORTATION.

Section 5 of the tariff act of 1897, which provides that whenever any country "shall pay or bestow, directly or indirectly, any bounty or grant upon the exportation of any article or merchandise from such country" which is dutiable under the act, an additional duty equal to such bounty or grant shall be collected thereon upon its importation into the United States, is a protective measure, and is intended to cover every case where by the laws of a foreign country the exporter is given, either directly or indirectly, a pecuniary benefit from the exportation, whether by way of a direct bounty paid from the public treasury, by the remission of taxes, or by exemption from taxes which would otherwise be imposed on the article.

2. SAME—LAWS OF RUSSIA—REMISSION OF TAXES ON EXPORTED SUGAR

The laws of Russia bestow a bounty or grant upon the exportation of so-called "free sugar," so as to work a benefit or advantage to the exporter in two ways: (1) By remitting the excise tax due upon the sugar exported, and (2) by the issuance by the government to the exporter of a certificate of exportation, which authorizes the sale in the domestic market of an equal quantity of "free reserve or free surplus" sugar without the payment of the additional tax otherwise required to be paid thereon, and which certificate is transferable and has a substantial market value; and such sugar, when imported into the United States, is subject to the additional or countervailing duty imposed by section 5 of the tariff act of 1897.

3. SAME—AUTHORITY OF SECRETARY OF TREASURY—CONCLUSIVENESS OF DECISION.

Under the provision of section 5 of the tariff act of 1897, that the net amount of any bounty or grant paid or bestowed by a foreign country on the exportation of an article or merchandise "shall be from time to

time ascertained, determined, and declared by the secretary of the treasury," the decision of the secretary as to such amount is conclusive, and cannot be reviewed by the courts; but the question whether a country pays or bestows such bounty or grant, where it depends upon the construction of the laws of such country, is a judicial one, and, while it is to be decided primarily by the secretary, his decision thereon is reviewable.

Appeal from the Circuit Court of the United States for the District of Maryland.

Ernest A. Bigelow, for appellant.

John C. Rose, U. S. Atty.

Before GOFF and SIMONTON, Circuit Judges, and PURNELL, District Judge.

GOFF, Circuit Judge. This is an appeal from a decree of the circuit court of the United States for the district of Maryland, entered in the matter of the petition of Robert E. Downs concerning the decision of the board of the United States general appraisers, rendered April 19, 1901, as to the construction of the law and the facts respecting the classification of, and rate of duty imposed on, certain Russian sugar, imported by said Downs at the port of Baltimore, Md. The collector of that port, acting under the provisions of section 5 of the tariff act of July 24, 1897, assessed and levied an additional or countervailing duty on said sugar, which was paid under protest by the importer, who, under the fourteenth section of the act of congress of June 10, 1890, had the action of the collector in so assessing such duty reviewed by the board of United States general appraisers. That board, after the questions involved had been carefully examined, affirmed the decision of the collector, and thereupon the importer, as he was authorized by law to do, asked the court below to review the matters of law and fact involved in said affirmance, which that court in due time did, and passed the decree affirming the decision of the board of general appraisers, now complained of.

We reach the conclusion that the collector of the port of Baltimore, under the provisions of the fifth section of the tariff act of July 25, 1897, properly imposed the duty now complained of by the appellant. We find that the Russian exporter of sugar obtains from his government a certificate, solely because of such exportation, which is worth in the open markets of that country from 1 ruble and 25 kopecks to 1 ruble and 64 kopecks per pood, or from 1.8 to 2.35 cents per pound. Therefore we hold that the government of Russia does secure to the exporter of that country, as the inevitable result of its action, a money reward or gratuity whenever he exports sugar from Russia, and we think it was from such indirect grants as this that the congress of the United States intended to protect the manufacturers of this country, by authorizing the secretary of the treasury to make all proper regulations for the assessment and collection of such additional duties as were imposed by the collector on the sugars imported by the appellant. The act of which said fifth section is a part was not only intended

113 F.—10

to aid in the collection of revenue, but also to encourage the industries of the United States, as is clearly stated in its title. One method of protection the congress had in mind was the imposition of an additional duty on all articles of merchandise imported into the United States from any country which had paid or bestowed, directly or indirectly, any bounty or grant upon the exportation of such merchandise, the same being dutiable under that act; such additional duty to be simply the net amount of the bounty or grant which had been allowed for the purpose of facilitating the exportation.

In affirming the decree of the court below, we also affirm the judgment rendered by the board of general appraisers, whose opinion so fully expresses our views, and so ably presents the facts involved herein and the law applicable thereto, that we deem it entirely appropriate to adopt the same as part of the opinion of this court. It is as follows:

"The importation in this case consists of refined sugar, which was exported from Russia, and arrived at the port of Baltimore as shown above. No controversy arises as to the proper classification of the sugar as made by the collector; his action in this particular not being challenged. The only question for decision relates to the imposition of a so-called countervailing duty, levied under the provisions of section 5 of the tariff act of July 24, 1897, which reads as follows:

"'Sec. 5. That whenever any country, dependency, or colony shall pay or bestow, directly or indirectly, any bounty or grant upon the exportation of any article or merchandise from such country, dependency, or colony, and such article or merchandise is dutiable under the provisions of this act, then upon the importation of any such article or merchandise into the United States, whether the same shall be imported directly from the country of production or otherwise, and whether such article or merchandise is imported in the same condition as when exported from the country of production or has been changed in condition by remanufacture or otherwise, there shall be levied and paid, in all such cases, in addition to the duties otherwise imposed by this act, an additional duty equal to the net amount of such bounty or grant, however the same be paid or bestowed. The net amount of all such bounties or grants shall be from time to time ascertained, determined, and declared by the secretary of the treasury, who shall make all needful regulations for the identification of such articles and merchandise and for the assessment and collection of such additional duties.'

"Under the authority conferred by this law, the secretary of the treasury has duly 'ascertained, determined, and declared' the net amount of the bounty or grant which, in his judgment, was bestowed by the laws of the Russian government upon the exportation of this sugar. T. D. 20,407, dated December 12, 1898; T. D. 22,814, dated February 14, 1901. It is not denied by either party to this suit that, if in fact any bounty or grant was bestowed, the secretary's finding as to its amount was correct. Moreover, it would seem that the decision of that officer as to this particular fact, being made in pursuance of a special statutory authority, would be quite as conclusive on this board and the courts as the finding of the value of foreign coin by the director of the mint, under the provisions of section 25 of the tariff act of 1894, a statute strictly analogous, which finding has been held to be conclusive, and not reviewable by this board or the courts. U. S. v. Klingenberg, 153 U. S. 93, 14 Sup. Ct. 790, 38 L. Ed. 647; Wood v. U. S., 72 Fed. 254, 18 C. C. A. 553, explaining Klingenberg's Case; Hadden v. Merritt, 115 U. S. 25, 5 Sup. Ct. 1169, 29 L. Ed. 333. It is conceded, however, that the decision of the secretary as to whether the laws of Russia do in fact bestow such a bounty or grant is reviewable by this board, as it involves the construction of the laws of Russia relating to the precise subject-

matter covered by said section 5, above cited. The jurisdiction of the board in this particular has been sustained by the United States circuit court of appeals for the second circuit in the recent case of U. S. v. Hills Bros. Co., 46 C. C. A. 167, 107 Fed. 107. Alluding to this phase of the subject, Hon. Lyman J. Gage, secretary of the treasury, has made the following observation: 'Do the Russian government regulations have such a bearing upon the facts of the case as to bring Russian sugar within the intent of said law as disclosed by its terms? While the question in its initiative lies with the administration of the treasury department, the question is of a judicial, rather than of an administrative, character, and its importance demands determination by a judicial tribunal. The board of general appraisers constitutes such a tribunal, and from its decisions appeal may be taken to the United States courts.' Cong. Record, 56th Cong., 2d Sess., p. 3335 (speech of Hon. J. R. Mann, of Illinois).

"The word 'bounty,' in its ordinary signification, may be defined to be 'an additional benefit conferred upon, or a compensation paid to, a class of persons.' 1 Bouv. Law Dict. (Ed. 1897) p. 269. The subject of sugar bounties has been a matter of consideration for the past 30 years or more, and has been discussed by various international conferences of the European powers, specially convened for the purpose of considering some suitable method for their suppression or modification, so far as relates to the continent of Europe and Great Britain and her colonies. A conference of this character was held at Brussels in June, 1898, the proceedings of which, under the denomination of 'Sugar Bounties,' have been published by authority of congress as senate document No. 171, fifty-sixth congress, second session, under the direction of the senate committee on finance. After an elaborate discussion and exchange of views between the delegates to this conference, the consensus of opinion among them seemed to be (page 61) that 'bounties whose abolition is desirable are understood to be all the advantages conceded to manufacturers and refiners by the fiscal legislation of the states that, directly or indirectly, are borne by the public treasury.' It was furthermore stated that 'there should be classified as such, notably: (a) The direct advantages granted in case of exportation; (b) the direct advantage granted to production; (c) the total or partial exemptions from taxation granted to a portion of the manufactured products; (d) the indirect advantages growing out of surplus or allowance in manufacturing effected beyond the legal estimates; (e) the profit that may be derived from excessive drawback.'

"It is important to observe, in the consideration of this subject, that section 5 of the tariff act of 1897, under which this case arises, does not use the word 'bounty' in any narrow or technical meaning. It embraces 'any bounty or grant' bestowed or conferred by the government, whether directly or indirectly. The word 'grant' is more comprehensive in meaning than the term 'bounty.' It implies the conferring by the sovereign power of some valuable privilege, franchise, or other right of like character, upon a corporation, person, or class of persons. Under the ancient laws of England this was deemed in many cases to be the prerogative of the king, who possessed large powers for the regulation of trade and commerce. It is stated, for example, by Macaulay, as follows: 'In addition to his [King James I.'s] undoubted right to grant special commercial privileges to particular places, he long claimed a right to grant special commercial privileges to particular societies and to particular individuals.' And again: 'He readily granted oppressive patents of monopoly.' 4 Macaulay, History of England, pp. 222, 223. A well-known instance of a similar grant was in the great 'Case of Monopolies' (Coke's Reports, pt. 11, p. 86), where a patent had been granted to the plaintiff, giving him the sole right to import playing cards and the entire traffic in them, and the sole right to make such cards within the realm. The court held that the grant to have the sole benefit of making them was 'against the common law and the benefit and liberty of the subject.' See comment on this case in Slaughter-House Cases, 16 Wall. 36, 103, 21 L. Ed. 394. In more modern times, the grant of special privileges by the Louisiana legislature to a particular class of persons, giving them a monopoly of establishing slaughter houses in the city of New Orleans, is another illustration. The supreme court, per Miller, J., speaking of the act of the legislature,

remarked: 'It is true that it grants, for a period of 25 years, exclusive privileges.' And again: 'We think it may be safely affirmed that the parliament of Great Britain * * * continued to grant to persons and corporations exclusive privileges,—privileges denied to other citizens,' etc. See, also, 15 Am. & Eng. Enc. Law, p. 711, 'Monopoly.'

"These cases are cited for the purpose of illustrating the broad and comprehensive meaning of 'grant,' which differs in many respects from 'bounty.' While it involves the idea of a favor or benefit conferred by the government, sometimes of an exclusive character, it does not necessarily embrace the act of appropriating or paying money out of the public treasury. Indeed, the word 'grant,' in its broad signification, may well include the remission of a tax already levied and assessed by the authority of government. It has been held that, in the absence of special statutory remedies, and sometimes in addition to such remedies, actions of debt may be maintained for the collection of taxes. Dollar Sav. Bank v. U. S., 19 Wall. 227, 240, 22 L. Ed. 80, 82, citing numerous English cases; also U. S. v. Lyman, 1 Mason, 482, 26 Fed. Cas. 1024 (No. 15,648), in which the question is exhaustively treated by Judge Story. There would seem to be no difference between the remission of a tax, and the resulting cancellation of the debt due the government, and a case where the tax may have been actually collected and paid into the treasury and then refunded and repaid by authority of law. A law enacted by the sovereign power, remitting the taxes due by a citizen for a single year or a specified number of years, in consideration of his rendering a service or engaging in an enterprise deemed of advantage to the public, would unquestionably be construed to be a 'bounty or grant' as fully as if the like amount of money had been actually collected and refunded under the technical name of a bounty. It has long been the practice in many of the American states for the legislature to confer charters on banks, railroads, and especially on manufacturing corporations, containing a special grant of exemption from taxation under the general laws of the state. Railroad v. Guffey, 120 U. S. 569, 7 Sup. Ct. 693, 30 L. Ed. 732; Given v. Wright, 117 U. S. 656, 6 Sup. Ct. 907, 29 L. Ed. 1021. In this connection, the remarks of Chief Justice Fuller in U. S. v. Passavant, 169 U. S. 16, 23, 18 Sup. Ct. 219, 222, 42 L. Ed. 644, 646, are of importance: 'Doubtless, to encourage exportation and the introduction of German goods into other markets, the German government could remit or refund the tax, pay a bonus, or allow a drawback. And it is found that, in respect of these goods, when "purchased in bond, or consigned while in bond, for exportation to a foreign country, this duty is remitted by the German government, and is called 'bonification of tax,' as distinguished from being refunded as a rebate." The use of the word "bonification" does not change the character of this remission. It is a special advantage, extended by government in aid of manufacturers and trades, having the same effect as a bonus or drawback. To use one of the definitions of drawback, it is "a device resorted to for enabling a commodity affected by taxes to be exported and sold in the foreign market on the same terms as if it had not been taxed at all." ' And again: 'Exoneration from its payment (i. e., payment of the tax) was a mere special advantage extended by the German government, as we have said, in promotion of manufactures and commerce.'

"The question, then, which is before us for consideration, is reduced to this: Did the laws of Russia and the regulations made by the minister of finance for the purpose of carrying such laws into execution operate to confer a 'bounty or grant,' directly or indirectly, upon the exportation of this sugar from the Russian dominions? And in making this inquiry it is immaterial in what manner the 'bounty or grant' was paid or bestowed. The law regards substances, not shadows; things, not names. The Russian law covering the production and exportation of sugar is an exceedingly complex scheme, both as it stands upon the statute book and as it is administered in actual practice. The system was pronounced by one of the delegates to the Brussels conference to be 'an extremely ingenious device,' and it was further said that 'the Russian empire is indebted to it for the notable increase in the output of sugar which has taken place since it came into operation,—all this with the appearance that no premium, in the narrow mean-

ing of the word, has been applied.' The leading features of the Russian law and regulations, as set forth in the stipulated agreement of facts and shown by the record, may be summarized as follows:

"Under the Russian law of November 20, 1895, sugar is divided into the three following classes (page 2 of stipulation, section IV.): '(a) "Free sugar," which consists of a certain quantity of sugar, which the Russian government permits a factory or refinery to sell for home consumption under an excise tax of 1.75 rubles per pood. (b) "An obligatory or indivertible reserve" of sugar, which consists of a certain quantity kept at each factory or refinery by order of the government, and which may not be sold or removed without the special permission of the government. (c) "Free reserve or free surplus," which consists of such sugar as is manufactured over and above the quantity of "free sugar" and "obligatory or indivertible reserve." This sugar may not be sold for home consumption, except upon payment of the regular tax of 1.75 rubles and an additional tax of 1.75 rubles, or 3.50 rubles in all.' And the Russian government fixes and determines the following conditions: '(a) The total quantity of sugar required for home consumption. (b) The quantity of "free sugar" allowed to each factory and the "obligatory reserve" which each factory or refinery shall keep on hand. (c) The maximum price at which sugar may be sold for domestic consumption.'

"It is admitted that the sugar imported in this case consists of 'free sugar,' as above defined, and would have been subject to a tax of 1.75 rubles per pood, if sold in Russia (about 2½ cents per pound, allowing 36 pounds to the pood). With the view of protecting home producers of sugar against foreign competition, the Russian government imposes an import duty on sugar of 3 rubles per pood, which is equivalent to about 4.28 cents per pound. Other important provisions of the Russian law are as follows:

" '(10) The delivery of sugar from factories and beet sugar refineries is allowed only upon permits of the excise supervisor, who certifies by his signature upon the transit document to the regularity of the delivery.'

" '(5) Sugar in excess of the normal production cannot be put on the home market otherwise than upon payment of an additional tax; the normal tax being payable according to the general regulation. However, it is allowed to the manufacturers to keep this excess of sugar as free reserve, and in such case, so long as the sugar does not leave the factory, they are not required to pay either the additional or the regular excise.'

"An important provision enabling the Russian government to control prices is found in section 7 of the law, which reads as follows:

" '(7) In cases where the prices in the home market exceed the normal prices fixed, the minister of finance authorizes the issuance of sugar from the obligatory reserve and from the free reserve (if necessary) in sufficient quantities to cause a decrease of prices without payment of the additional tax, but with payment of the normal excise.'

"Section 9 runs as follows:

" '(9) Upon the exportation from factories of the excess of sugar, the same is exempted from excise and additional tax in full measure.'

"The minister of finance, acting in conjunction with a committee of ministers, is authorized either to reduce or to suspend totally for a given period of time the provision of the Russian law which exempts exported sugar from not only the normal tax, but also the additional tax as well. Such action would operate to subject imported sugar to the full tax of 3.50 rubles per pood (equal to about 5 cents per pound). The particular bounty or grant which seems to be conferred by the Russian law upon the exportation of sugar accrues under section 39 of said law, providing that 'a manufacturer may cede to another manufacturer his right to place on the home market free—i. e., without the payment of an additional tax—his allotted quota of sugar.' This cession can be made only in accordance with certain rules prescribed in section 40 of said law, by which notice of such transfer is required to be given to the local excise board, authorizing the reduction of the quantity of free sugar in one mill and the increase thereof by assignment at another mill. This cession or transfer is accomplished by means of gov-

ernment certificates or vouchers, which operate as follows: Refiner A. is authorized to get the benefit of the failure of refiner B. to supply the home market with his full quota of free sugar. Home refiner A. becomes willing to pay refiner B. a certain required sum if he will export a portion of his allotted quota of sugar, and he accordingly gives A. the official evidence of such exportation in the form of a voucher or certificate, as above described; and this, under the operation of the Russian law and regulations, authorizes A. to sell in the home market, at a tax of 1.75 rubles per pood, an equivalent portion of the sugar produced by him (A.) in excess of his quota. One of the purposes of these transfers is expressly stated to be 'in order to facilitate the exportation of the surplus to foreign countries.' Sections 39, 40.

"The character and value of these certificates are further explained in the following extracts from the stipulated agreement of facts in this case:

" '(VI.) That, upon the exportation of said sugar from Russia, the Russian government, under its laws and regulations, released said sugar from said tax of 1.75 rubles, either by a refund of the tax, or a cancellation of indebtedness, or otherwise.

" '(VII.) That, in addition to remitting said excise tax, the government issued to the exporter a certificate certifying that he had exported such a quantity of so-called free sugar. The said certificate and such certificates for free sugar have a substantial market value, and are transferable, and the price thereof is usually determined by the difference existing at the time between the price obtainable for the sugar on the home market and the price obtainable abroad.

" '(VIII.) That said certificates are sold to and used by sugar manufacturers or refiners, who are thereby enabled to transfer from their "free reserve or free surplus" to their "free sugar" an amount of sugar equal to the amount shown by said certificates to have been exported, which amount may then be sold for domestic consumption on paying the ordinary tax of 1.75 rubles per pood (to which free sugar is regularly subject).'

"The following statement on this subject is made in the report of the American consul to the treasury department, and which was admitted in evidence at the hearing:

" 'On shipment abroad of sugar which cannot be placed on the home market without the payment of additional excise, the latter—i. e., the excise—is guarantied by approved securities, and for this sugar a certificate is given to the effect that the same has been manufactured at such a factory in such a year and figures in the category of "free reserve," and is being sent abroad through such custom house. When thereafter this sugar arrives at the custom house and has been shipped abroad, the customs authorities make an indorsement on the certificate and also issue to the shipper quittances, which are accepted in lieu of payment of the excise computed as being due on that sugar. The manufacturer presents this certificate to the local excise administration, which sets the securities free which were deposited when the sugar was being removed from the factory. To avoid the necessity of giving securities as guaranty for additional excise, and, in general, for the greater freedom in business transactions, the manufacturer is granted the right to export abroad "free sugar,"—i. e., that on which no additional excise is payable. For such sugar, on its being taken from the factory, a certificate is given, on which is written "Free Sugar." When thereafter the sugar is exported abroad, and an indorsement is made on the customs certificate, then, on presentation of this certificate to the local excise inspection, the latter transfers to the "free sugar" an equal quantity from the "free reserve." It is, of course, understood that on the exportation abroad of free sugar the customs authorities also issue quittances, which are valid in lieu of payment of excise on sugar. It is permitted to export free sugar abroad, not only for the purpose of liberating for admission to the home market the "free reserve" of any one factory, but also of any other factory. For this purpose the owners of the factories who enter among themselves into such an agreement must notify their local excise officials, and these in turn must notify each other. That factory which desires to export abroad its free sugar, say 5,000 poods, for the account of:

another factory indicated by it, asks for the transfer in its factory and excise books of 5,000 poods from the category of "free sugar" to the category of "free reserve" in order that from the category of the "free reserve" of the other manufacturer 5,000 poods may also be transferred to the category of "free sugar." The other manufacturer hands in a notice for the liberation of 5,000 poods of the free reserve from the additional excise and its transfer to the category of free sugar, in view of the fact that in its place 5,000 poods of the free sugar have been transferred to the free reserve of the first manufacturer. Consequently the first manufacturer ceded to the second his right of placing on the home market 5.000 poods, which he can now only sell abroad or pass out into the home market after payment over and above the excise of the additional excise of 1.75 rubles per pood. As the first and second methods of disposing of this sugar are less advantagrous than placing the article on the home market as free sugar, the manufacturer who ceded his right receives from the manufacturer who acquired the right the price per pood agreed upon between them, which is usually determined by the difference existing at the moment between the price obtainable for the sugar and on the home market and the price obtainable by sale abroad. This is what is termed a "transfer." Dependent upon the fluctuations in price of sand sugar in Russia and abroad, the price of these transfers also varies. Therefore, the person who sells the transfer (the right of issue into the home market) charges several kopecks more than the difference mentioned above. This is done on account of the risk that is taken that sugar prices abroad may fall, and also for the trouble involved in exporting, etc. Example: Price of sand sugar at a station in the southwestern region: (a) For the home market, Rs. 4.25 per pood, or, without excise, Rs. 2.50: (b) for abroad, Rs. 1.25. Consequently the difference or value of transfer is Rs. 1.25; but in that case, for the reasons given, Rs. 1.28 to Rs. 1.30 is paid for the transfer. * * * For example, four sugar factories far away from the shipping port have to export 50,000 poods each, or in all 200,000 poods. Another factory situated near a shipping port, to which the freight is cheaper, and with the demand for sugar not great, finds it more profitable to export its entire output (250,000 poods), and receives export certificates for this quantity. These certificates are given to the owners of the four factories mentioned, and these in turn deliver 200,000 poods of sugar, which can be sold on the home market whenever the owner pleases. It should have been stated that certificates to the extent of 200,000 poods are exchanged for the same quantity of sugar, and not 250,000 poods. These certificates can be sold to a bank, or to a speculator who has engaged to deliver sugar at the port abroad to which the sugar was shipped. The government also takes these certificates in payment of excise at par; i. e., 1 ruble 75 kopecks a pood.'

"The natural result of the Russian laws governing the sugar industry is the accumulation of a large surplus of sugar, and the disposal of such surplus has proved a problem of no small difficulty. Much of it has necessarily gone abroad for export, even at a less to the manufacturers. It is manifest from the foregoing considerations that the exporter of sugar from the Russian empire, under the provisions of the Russian laws already mentioned, as enforced by the regulations of the minister of finance, receives a valuable bonus through the operation of such laws and regulations, and that this bonus accrues to him upon the exportation of his sugar. The export certificates or vouchers, to which we have referred, are only the legal evidence of this valuable privilege or grant conferred by the government, without whose authority such transfers of sugar would be valueless and of no effect. Our conclusion, therefore, is that a bounty or grant, within the meaning of section 5 of our tariff act, has been paid or bestowed by the Russian government upon the exportation of this sugar, so as to work a benefit or advantage to the Russian sugar exporter, as follows: First. Upon the exportation of the sugar, the government remitted or refunded the excise tax due thereon, or otherwise canceled the indebtedness of the sugar manufacturer, so that he was enabled to place his product upon the market free from the burden of either the regular or additional excise tax. Second. The certificate which the government issued to him upon the exportation

of his sugar had a substantial market value, and was transferable, and operated as a premium, grant, bonus, or reward. Looked at from the Russian standpoint, these advantages might, perhaps, be described as a bounty on production; but (in the language of the circuit court of appeals in the Hills Bros. Co. Case, supra), 'from the standpoint of other countries,' they become a bounty or grant on exportation. It will be observed, too, that in the Hills Bros. Co. Case it was the fact alone of the remission of the excise tax by the Dutch government which brought into operation the bounty received by the sugar makers. In other words, it created it; for without such remission there would have been no bounty. It is immaterial, we may add, whether the price obtained for the exported sugar reaped a profit or inflicted a loss upon the manufacturer or producer. The simple inquiry is whether, at whatever price he may have sold it, he received a bounty or grant of pecuniary value, upon its exportation by reason of and through the operation of the system of laws of the Russian empire designed for the regulation of the sugar industry, both for home consumption and exportation.

"There is nothing in the decision of the circuit court of appeals in the case of U. S. v. Hills Bros. Co., supra, which, in our judgment, conflicts in any manner with the conclusions we have reached in this case. On the contrary, the reasoning of the court is strongly confirmatory of the views we have expressed. That decision, it may be noted, reversed the decision of the circuit court holding that the bounty paid by Holland was a bounty on production (99 Fed. 425), and affirmed the decision of this board, which held it to be a bounty on exportation. In re Hills Bros. Co., G. A., 4261. In examining the mass of evidence introduced in this case, and in construing the Russian laws and regulations, we have borne carefully in mind the principle laid down by Mr. Justice Miller in Henderson v. Mayor, 92 U. S. 259, 268, 23 L. Ed. 543, 547, that 'in whatever language a statute may be framed, its purpose must be determined by its natural and reasonable effect.'

"Testing the Russian sugar laws by this standard, and giving to the importer the benefit of every reasonable doubt as to the construction of the law, we are impelled to the conclusion that the Russian sugar statutes and regulations operate to pay or bestow a bounty or grant, directly or indirectly, upon the exportation of sugar. The protest is overruled, and the decision of the collector is affirmed."

The decree appealed from is affirmed.