58 CCPA

The **UNITED STATES** (Ralph Valls,
Party-in-Interest), Appellants,

v.

**HAMMOND LEAD PRODUCTS, INC.,**
Appellee.

Customs Appeal Nos. 5392, 5393.

United States Court of Customs
and Patent Appeals.
April 22, 1971.

Almond, J., dissented and filed opin-
ion in which Baldwin, J., joined.

William D. Ruckelshaus, Asst. Atty.
Gen., Andrew P. Vance, Chief, Customs
Section, New York City, Anthony J.
Steinmeyer, Civil Division, Department
of Justice, Washington, D. C., for the
United States.

Paul A. Lenzini, Washington, D. C.,
for party-in-interest, appellant.

Albert H. Greene, Alvord & Alvord,
Washington, D. C., for appellee.

Before RICH, ALMOND, BALDWIN
and LANE, Judges, and NICHOLS,
Judge, United States Court of Claims,
sitting by designation.

NICHOLS, Judge.

This is an appeal from a decision and judgment of the United States Customs Court, First Division, 63 Cust.Ct. 316, C.D. 3915 (1969), sustaining the protest of an American manufacturer, Hammond Lead Products, Inc., appellee, and ordering reliquidation of entry.

On May 2, 1967, appellee filed a complaint asserting that litharge, item 473.-52 of the Tariff Schedules of the United States (TSUS), imported from Mexico, was the recipient of a bounty or grant from the Mexican government, and consequently, a countervailing duty was required to be imposed under the mandate of the Tariff Act of 1930, section 303, 19 U.S.C. § 1303. The Commissioner of Customs, acting for the Secretary of the Treasury, notified appellee that in his view the classification and rate of duty on litharge were correct and that countervailing duties were not applicable. Thereupon appellee protested pursuant to the Tariff Act of 1930, section 516(b), 19 U.S.C. § 1516(b), the classification and rate of duty assessed upon such litharge, which protest was duly docketed in the Customs Court. Appellants moved to dismiss the protest on the ground that the court below lacked jurisdiction on the subject matter to entertain an American manufacturer's protest under section 516(b) which complained that the Secretary of the Treasury failed to invoke a countervailing duty under the mandate of section 303. Following the filing of written briefs and oral argument, the Customs Court denied the motions of both appellants, 61 Cust. Ct. 137, C.D. 3552 (1968). Trial on the merits followed, and the Division unanimously sustained appellee's protest in the other decision cited.

Appellant United States is before this court seeking review and reversal of the Customs Court on the merits, while appellant Party-in-Interest seeks review of the decision below on both the jurisdictional aspect and on the merits.

The statutes involved are:

Item 473.52, TSUS:

Pigments (except pigments, in dry form, described in the foregoing provisions of this subpart):

\* \* \* \* \* \*

Containing lead:

\* \* \* \* \* \*

Item 473.52 Litharge . . . .1.25¢ per lb.

Tariff Act of 1930, Section 303, 19 U.S.C. § 1303:

*Countervailing duties.*

Whenever any country, dependency, colony, province, or other political subdivision of government, person, partnership, association, cartel, or corporation shall pay or bestow, directly or indirectly, any bounty or grant upon the manufacture or production or export of any article or merchandise manufactured or produced in such country, dependency, colony, province, or other political subdivision of government, and such article or merchandise is dutiable under the provisions of this chapter, then upon the importation of any such article or merchandise into the United States, whether the same shall be imported directly from the country of production or otherwise, and whether such article or merchandise is imported in the same condition as when exported from the country of production or has been changed in condition by remanufacture or otherwise, there shall be levied and paid, in all such cases, in addition to the duties otherwise imposed by this chapter, an additional duty equal to the net amount of such bounty or grant, however the same be paid or bestowed. The Secretary of the Treasury shall from time to time ascertain and determine, or estimate, the net amount of each such bounty or grant, and shall declare the net amount so determined or estimated. The Secretary of the Treasury shall make all regulations he may deem necessary for the identification of such articles and merchandise and for the assessment and collection of such additional duties.

Tariff Act of 1930, Section 516(b), 19 U.S.C. § 1516(b):

(b) *Classification.*

The Secretary of the Treasury shall, upon written request by an American manufacturer, producer, or wholesaler, furnish the classification of, and the rate of duty, if any, imposed upon designated imported merchandise of a class or kind manufactured, produced, or sold at wholesale by him. If such manufacturer, producer, or wholesaler believes that the proper rate of duty is not being assessed, he may file a complaint with the Secretary, setting forth a description of the merchandise, the classification, and the rate or rates of duty he believes proper, and the reasons for his belief. If the Secretary decides that the classification of, or rate of duty assessed upon, the merchandise is not correct, he shall notify the collectors as to the proper classification and rate of duty and shall so inform the complainant, and such rate of duty shall be assessed upon all such merchandise entered for consumption or withdrawn from warehouse for consumption after thirty days after the date such notice to the collectors is published in the weekly Treasury Decisions. If the Secretary decides that the classification and rate of duty are correct, he shall so inform the complainant. If dissatisfied with the decision of the Secretary, the complainant may file with the Secretary, not later than thirty days after the date of such decision, notice that he desires to protest the classification of, or rate of duty assessed upon, the merchandise. Upon receipt of such notice from the complainant, the Secretary shall cause publication to be made of his decision as to the proper classification and rate of duty and of the complainant's desire to protest, and shall thereafter furnish the complainant with such information as to the entries and consignees of such merchandise, entered after the publication of the decision of the Secretary at the port of entry designated by the complainant in his notice of desire to protest, as will enable the complainant to protest the classification of, or rate of duty imposed upon, such merchandise in the liquidation of such entry at such port. The Secretary shall direct the collector at such port to notify such complainant immediately when the first of such entries is liquidated. Within thirty days after the date of mailing to the complainant of notice of such liquidation, the complainant may file with the collector at such port a protest in writing setting forth a description of the merchandise and the classification and rate of duty he believes proper. Notwithstanding such protest is filed, merchandise of the character covered by the published decision of the Secretary, when entered for consumption or withdrawn from warehouse for consumption on or before the date of publication of a decision of the United States Customs Court or of the United States Court of Customs and Patent Appeals, rendered under the provisions of subsection (c) of this section, not in harmony with the published decision of the Secretary, shall be classified and the entries liquidated in accordance with such decision of the Secretary, and, except as otherwise provided in this chapter, the liquidations of such entries shall be final and conclusive upon all parties. If the protest of the complainant is sustained in whole or in part by a decision of the United States Customs Court or of the United States Court of Customs and Patent Appeals, merchandise of the character covered by the published decision of the Secretary, which is entered for consumption after the date of publication of such court decision, shall be subject to classification and assessment of duty in accordance with the final judicial decision on the complainant's protest, and the liquidation of entries covering such merchandise so entered or withdrawn shall be suspended until final disposition is made of such protest, whereupon such entries shall be liqui-

dated, or if necessary, reliquidated in accordance with such final decision.

We conclude that the Customs Court lacked jurisdiction and reverse on that ground. Those interested in the facts and record in detail can find them stated in the decisions below. In view of our conclusion, a summary will suffice here. Briefly, then, Mexico has had in recent years an exportable surplus of refined lead, and has therefore figured in the world lead market. Lead is traded on the London Metal Exchange and has a world price established there daily. Litharge is a lead oxide, made from refined lead by a simple process, and containing 93% primary lead metal. Its main use is in storage batteries, and in the chemical and paint industries. In 1954, as we take judicial notice, Mexico devalued the peso from 8.65 to 12.50 per dollar. In connection therewith she increased existing export taxes on lead for the purpose of maintaining domestic supplies and keeping down domestic prices. Thereafter refined lead remained available or was made available to domestic users approximately at the world price adjusted less the export tax, which was of course not applicable. Sales of lead for export subject to tax were at the world price. The export tax was, however, not applied thenceforward to exports of litharge and consequently, Mexican litharge producers could offer litharge in other countries with a price predicated on the domestic lead price unenhanced by the export tax. This exemption enabled Mexican litharge to enjoy in world markets a more favorable price in relation to lead, Mexican and other, than would have been normal. Exports of litharge to the United States rapidly increased, reaching a level which injured the appellee company in its business. The theory of the trial court was that an indirect bounty or grant on export of litharge existed, within the meaning of section 303, not just because of its exemption from export tax, but also from what the court viewed as the supply of lead to the Mexican litharge manufacturers at an artificially low price.

As to the jurisdictional issue, the question of course is whether the Congress intended that the countervailing duty provision of the Tariff Act of 1930, section 303, *supra*, is to work in harness with the American Manufacturer's Protest, section 516(b), *supra*, so that an American manufacturer can obtain the assessment of countervailing duties by reason of the action of a foreign government, without the acquiescence of the Treasury Department in the assessment. This is a novel question, so far as we know, and a momentous one, fraught with consequences as to the control of the executive branch over the foreign relations and foreign policy of the United States.

The text of section 516(b) indicates plainly in two ways that some issues are excluded from the American Manufacturer's Protest that the importer could litigate if he were the one aggrieved. First, the Secretary is to furnish him on demand "*the* classification of, and *the* rate of duty, if any * * *" (emphasis supplied) raising a doubt right away as to whether the provision has application to special and additional duties, above and beyond the regular ones normally applicable to products of all countries with which we have most favored nation commitments. When such exactions are involved, the Secretary could not respond with *the* rate of duty but with several, depending on circumstances. Next, section 516(b) does not embody the sweeping language of section 514 which makes reviewable at the importer's instance "all exactions of whatever character". Thus, there must be some customs exactions, of some character, not litigable under 516(b).

Again, the text of section 303 requires the Secretary to determine the "net amount of each such bounty or grant." It may appear somewhat absurd to sever determination of the existence of a bounty or grant from the amount of it, but this is the result if the court may determine that a bounty or grant was paid, without the Secretary's concurrence. The trial court would have remanded after de-

termining there was a bounty or a grant, to let the Secretary determine its amount, which the statute expressly says he must do. Could the Secretary now determine that the "net amount" was one peppercorn per ton? If the court does not know how to calculate the bounty or grant, how does it know there was one? A clear separation, as between "entitlement" and "damages" in a contract dispute, just does not exist in this class of issue. Thus in Energetic Worsted Corp. v. United States, 53 CCPA 36, 37, C.A.D. 874 (1966), this court reversed, killing the controversy, because the Treasury determination as to the *amount* of the alleged bounty was not adequately substantiated.

It would appear that customs penalties, as a class, are "exactions" included in section 514 and left out of section 516 (b). This is the most natural explanation of the language discrepancy. It would be obnoxious on several grounds for domestic industries to be given a litigable interest in the assessment of penalties upon importers, and moreover, against the Secretary's best judgment it would be futile, because he could always mitigate or remit the penalties under section 618, Tariff Act of 1930, 19 U.S. C. § 1618.

There is a line of cases where the courts have reviewed the Secretary's determination that a bounty was bestowed by a foreign government and held the imposition of countervailing duty justified thereby. F. W. Woolworth Co. v. United States, 115 F.2d 348, 28 CCPA 239 (1940); V. Mueller & Co. v. United States, 115 F.2d 354, 28 CCPA 249 (1940); Nicholas & Co. v. United States, 7 Ct.Cust.Appls. 97 (1916), aff'd, 249 U. S. 34, 39 S.Ct. 218, 63 L.Ed. 461 (1919); Downs v. United States, 113 F. 144 (4th Cir. 1902), aff'd, 187 U.S. 496, 23 S.Ct. 222, 47 L.Ed. 275 (1903). But in each of these cases, the protest was being made by an importer under section 514 or its predecessors, not by "American manufacturers, producers, and wholesalers" under section 516(b). An importer, of course, would never have occasion to make a challenge of the kind made here, that the countervailing duty should have been levied, though in fact it was not.

We further hold that section 303 is penal in character. We have had other instances in customs law of exactions held by courts to be penal, though designated by Congress as "additional duties." The best example is Helwig v. United States, 188 U.S. 605, 23 S.Ct. 427, 47 L.Ed. 614 (1903). This involved the "undervaluation duty" imposed for any deficiency in the entered value of imported merchandise as compared to the value as appraised by Customs officials. The absence of intent to defraud or mislead, indeed the importer's entire innocence, was no defense. This came down to comparatively recent days as part of section 489 as originally enacted in the 1930 Act. The Supreme Court viewed the penal character of it as enhanced, not mitigated, by its indifference to the importer's righteous intent. By analyzing the financial consequences of the so-called duty the Court showed that its purpose was not to raise revenue but to halt practices Congress regarded as objectionable by harsh monetary exactions out of all proportion to the regular duties involved. Subsequent to the importation, but prior to the decision, the Congress amended the provision to declare it should not be regarded as penal, but the Court refused to give this retroactive effect.

The D. C. Circuit followed *Helwig* in Cotonificio Bustese S. A. v. Morgenthau, 74 App.D.C. 13, 121 F.2d 884 (1941). The plaintiff had incurred the additional ten percent duty under section 304, Tariff Act of 1930, 19 U.S.C. § 1304, for an importation not properly marked to show country of origin. The court mandamused Secretary Morgenthau to require him to consider whether he should exercise in the case the discretionary authority he had under section 618, to mitigate or remit penalties. Repeating the *Helwig* history, Congress amended

the marking law to declare, as it now does, that it should not be regarded as penal and should not be remitted.

Section 303 differs from the exactions above considered in that the offending party is considered to be a foreign government, not a producer or importer. We do not regard this as a significant distinction. As in the case of the other exactions above discussed, the purpose is not to raise revenue but to halt a practice deemed objectionable by a harsh monetary exaction. The Congress has never declared it is not penal, unlike the other cases, and this would be consistent with a desire on its part that section 303 exactions should be under the full control of the Secretary of the Treasury. We note that in the case of the countervailing duty assessment, no injury to a domestic industry need be shown. This fact appears inconsistent with any theory that the countervailing duty is merely protective in character.

Bradford Co. v. American Lithographic Co., 12 Ct.Cust.Appls. 318, T.D. 40318 (1924), so heavily relied on by the court below, is apparently inconsistent with the view here expressed, and is best explained on the hypothesis that the ten percent marking duty there involved was not regarded as penal. Our predecessor court held that an American manufacturer could use section 516(b) procedure to protest a failure to assess the ten percent marking duties under section 304. *Bradford* was cited to the D. C. Circuit in *Cotonificio Bustese* but a footnote shows the D. C. Circuit was apparently under the impression that *Bradford* was decided under sections 514 and 515 and therefore did not fully appreciate the logical conflict between its decision and that of this court's predecessor.

▮ The duty under section 304 for not marking relates to a physical characteristic of the merchandise, observable on its examination by Customs officers, although an importer who pays the duty cannot thereby obtain the right to import without marking. The court reasoned that the discovery by Customs officers that the merchandise was not properly marked was "classification." It cannot be said that the ascertainment that a retaliatory duty is due is likewise "classification", as it relates to something apart from the physical characteristics of the imports. We think that the *stare decisis* authority of the Bradford case should be restricted to special duties allegedly due under section 304, and special duty cases under other laws should be deemed *res integra*.

The dumping duty under 19 U.S.C. § 160 and ff., falls in the same category as the foregoing, as a special duty, but it seems clear that whether or not penal, the roles assigned to the Secretary of the Treasury and the Tariff Commission are such that bypassing them in a 516(b) proceeding is out of contemplation. *But, cf.,* North American Cement Corp. v. Anderson, 109 U.S.App.D.C. 162, 284 F. 2d 591 (1960). The provision in section 338, Tariff Act of 1930, 19 U.S.C. § 1338, for retaliatory duties or embargoes in cases of foreign discrimination against American products or commerce appear to be clearly penal, though evidently but little invoked. That a domestic industry could bypass the President in a 516(b) proceeding and obtain the assessment of such retaliatory duties, without his concurrence, is something that without prejudging would appear to be contrary to Congressional intent. It is of interest in that connection to note that prior to the 1930 Act, the term "countervailing duty" included not only duties to countervail bounties or grants, but also duties to retaliate against foreign countries when they assessed duties on American products although similar products, imported here, would be duty free. U. S. Tariff Commission, Dictionary of Tariff Information (1924), 205. The term also included duties to retaliate against discriminations against the United States, including export taxes that raised the cost of raw materials to American manufacturers. *Op. cit., supra.* In general, apparently any kind of retaliatory duty was a "countervailing duty."

■ All considered, it appears that countervailing duty is a penal exaction that the Congress did not intend the courts to impose, should the Treasury be recalcitrant, in a 516(b) proceeding, and is not a "duty" within the meaning of that section.

■ Further, we note that Article III courts should abstain if possible from passing on controversies not essentially judicial in nature. *Cf.*, Glidden v. Zdanok, 370 U.S. 530, 82 S.Ct. 1459, 8 L.Ed. 2d 671 (1962). In the assessment of a countervailing duty, the determination that a bounty or grant is paid necessarily involves judgments in the political, legislative, or policy spheres. In Glidden v. Zdanok, *supra*, the review of Tariff Commission determinations under the Tariff Act of 1930, section 337, 19 U.S.C. § 1337, was held nonjudicial business. Therefore, if doubtful, the question of jurisdiction here should be resolved against jurisdiction.

There are some standards and guidelines in the statutory language. The problem is with the undefined "indirect bounty". If it is direct, there is no problem, but foreign governments with plans to subsidize their exports are rarely that cooperative with the U. S. Treasury and courts. We all know that foreign exchange is desperately needed by most governments, and is always insufficient to their needs, and that hardly a one of them does not do all it can to encourage exports: this includes our own. Yet according to the court dicta quoted by the court below and appellee here, (dicta delivered in other than a 516(b) context), any government measure to encourage exports in any substantial way would be an indirect bounty or grant, and we should be assessing countervailing duties against imports from all the countries of the world. We all know we do not, as a practical matter. We pick and choose one apparent indirect bounty for this type of retaliation, and ignore another. The practical standard may well be whether the indirect bounty seems reasonable or unreasonable in the circumstances.

In this case there has been much theorizing by counsel about the assessment of stiff excises on the home production of an article with full exemption of the same article when exported. *E. g.*, IRC of 1954, sections 5001, 5247, as to distilled liquor. It is obvious that such a policy is a powerful incentive to the manufacturer to expand his foreign markets at the expense, if necessary, of those at home. Theoretical arguments why this is not an indirect bounty fail to convince. It is urged that the excise, being really on consumption, is left to be assessed on the consumer in the importing country. That does not always occur: many of these tax exempt exports find their way into tax exempt markets. And so far as it is true, it only shows that this indirect bounty on exports is not an unreasonable one. We all know that this country does not assess countervailing duties on articles, stimulated on their way to our shores by such policies, because our government does it too.

Payment of tariff drawbacks on the content of imported material in exported manufactures is avowedly to stimulate exports. It supplies the manufacturer with his raw materials at a cheaper rate if, but only if, he manufactures for export. The United States does that too, under Tariff Act of 1930, section 313, 19 U.S.C. § 1313, as amended. We do not think it too much to say that if a foreign country adopted a law exactly like section 313, as amended, and if a foreign product on which drawback was paid under that law came to the United States, and was protested under section 516(b), the trial court would be compelled by the logic of its opinion and the authorities it cites, to assess countervailing duties.

Nothing, at least in the short range, stimulates exports more than a devaluation of the currency. After devaluation, the exporter gets more home currency for each article he exports, and with it can purchase more goods and services at home, and he obtains these benefits largely at the expense of the producer for the home market who now gets paid

in devalued currency. Yet we do not assess countervailing duties against countries because they devalue their currencies. Why not? The only valid reason is that these devaluations have been encouraged by our government, in the effort it has expended since Bretton Woods for a worldwide system of freely convertible currencies.

■ The Congress is, of course, well aware of these problems, and it would seem it elects to rely on executive discretion to avoid making the United States ridiculous by penalizing imports from foreign countries which have taken reasonable action, action our own government takes or counsels. Countervailing duties are strong medicine, well calculated to arouse violent resentment in countries whose trade practices are branded by the court as unethical. In what has been hitherto the regular practice of the Treasury Department making the decision to assess countervailing duties, the decisions, not necessarily partisan political, but political in a broad sense, legislative, or of a policy nature, can be made by an agency that is equipped and staffed to make them. There can be no doubt that the Secretary is under a legal duty to assess countervailing duties if he sees a bounty or grant being paid, but we think he does and must exercise some discretion in defining what acts of foreign governments confer bounties or grants, when the case is doubtful. We think too, that the question whether an indirect bounty or grant is paid does not lend itself to a legal answer without the help of other disciplines. Courts that appeared to deal with the issue as purely legal, hitherto have had the benefit and help of Treasury expertise, since the issue has always come up under section 514, on an importer's protest of a Treasury action. Courts, reviewing the Treasury decision, need not redo the whole thing but could concentrate on the aspects susceptible of judicial resolution.

Thus the true Congressional intent, with respect to section 303, we believe contemplates some moderate degree of executive discretion in defining what sort of foreign governmental actions constitute indirect bounties or grants. An alleged indirect bounty or grant reasonably not seen as such by the executive is a case outside the contemplation of Congress. Instances of cases outside the scheme and purpose of Congress but within the literal language of Federal statutes, or vice versa, are not uncommon and courts are required to deal with them: e. g., Church of the Holy Trinity v. United States, 143 U.S. 457, 459, 12 S.Ct. 511, 36 L.Ed. 226 (1892); Helvering v. Hammel, 311 U.S. 504, 510–511, 61 S.Ct. 368, 85 L.Ed. 303 (1934); Select Tire Salvage Co. v. United States, 386 F.2d 1008, 181 Ct.Cl. 695 (1967). A classic case in this court is Procter & Gamble Mfg. Co. v. United States, 19 CCPA 415, TD 45578 (1932), cert. denied, 287 U.S. 629, 53 S.Ct. 82, 77 L.Ed. 546, in which it was held, because the statutory scheme as a whole so required, that whale oil produced on the high seas was "imported from a foreign country."

It seems to us to be thus outside the contemplation of Congress, therefore, that anyone should bypass the executive branch in this class of case, by invoking 516(b) procedure as was done here. In the generations of those who wrote sections 303 and 516(b), no one seems to have thought of doing it. It had to wait until those who had any personal contact with these Congressional actions had gone to their rewards. We think the fit of 303 and 516(b) is not so close as to show by themselves that in framing either the other was in contemplation, and legislative history does not help. The dealing with countervailing duties in the General Agreement on Tariffs and Trade, Par. 4 of Article VI, 61 Stat. A11 (1947) seems to reflect a belief on the part of Treasury in 1947 that it could veto an assessment of countervailing duties if it chose, and Congress has not since enacted anything to contradict that assumption.

We have considered the amendments the Congress has made to the Tariff Act sections here construed in The Cus-

toms Court Act of 1970, P.L. 91–271, 84 Stat. 274, Approved June 2, 1970, although they come too late to affect the jurisdiction of the Customs Court over the instant protest. We observe that despite some language changes, the distinction we consider so significant still obtains between the review of "all charges or exactions of whatever character" on an importer's protest, and review only of decisions relating to appraisement or classification or rate of duty in the case of the American Manufacturer's Protest. The amendment in section 209 to the latter provision is stated by the House Committee not to have a substantive effect on the rights of the parties and to be intended only to consolidate appraisal and classification procedures. U.S.Code Cong. & Adm. News, 91st Cong., 2d Sess., pp. 3188, 3217. Therefore, if a refusal to assess a penal or retaliatory special duty was not protestable previously under section 516(b), it still is not.

It may be asked, if our interpretation of section 516(b) is correct, does it leave the American Manufacturer entirely remediless even in case of an arbitrary and capricious refusal by Treasury to take appropriate action under the countervailing duty law. It is difficult to answer the question without deciding in dictum cases not before us, but a few observations will be made. The Second Circuit, in J. C. Penney Company Inc. v. United States, 439 F.2d 63 (1971), has considered the new statute and reaffirmed holdings under the old, that the regular Federal courts will not interfere in customs cases reviewable in the Customs Court, because an importer desires to tailor a remedy more satisfactory to him than the Customs Court affords. A case of an American Manufacturer having no remedy at all in the Customs Court is greatly different. It is anomalous for anyone but the Government and the taxpayer to have a litigable interest in the assessment of a tax. However, the Congress has recognized the strong economic interest of domestic industry in the maintenance of adequate protective duties, and has fashioned a special remedy in limited circumstances. It is candidly not co-extensive with the importer's protest in significant respects, for example, in being denied retroactive effect. It has been held to be "[the] grant of an extraordinary privilege which must be strictly construed against the grantee." The Cronite Co., Inc. v. United States, 38 Cust.Ct. 76, 83, C.D.1847, 150 F.Supp. 754, 761 (1957, per Lawrence, J.). The Congress may well have intended the scope of section 516(b) to be all the scope to litigate the domestic industry should be allowed to have. Of course, any customs exaction benefits the domestic industry to the extent it hinders the importer and weakens him financially and as a competitor. The need of the domestic industry for full enforcement of regular duties, however, might have appeared to Congress much greater than in the case of penal or retaliatory exactions. The former may be the basis on which capital is invested and production planned. No one would depend on the continuance of an exaction, the very purpose of which is to end the practice that called it into being. Thus it may be that any decision limiting 516(b) may correspondingly limit the access of a complaining domestic industry to any kind of court relief. On the other hand, the modern tendency to fashion a remedy for any injury is a strong one, and it could be the regular courts would take jurisdiction in cases outside section 516(b), where the domestic industry showed clear illegality and substantial injury. Such a proceeding would not be a *de novo* determination like the one the court below made here, but would, we think, be more in the nature of a review of the administrative decision, which would be overturned only if found arbitrary, capricious, or not founded on substantial evidence. A court considering the fashioning of such relief would have to consider its need in light of judicial remedies, and also such extra-judicial ones as the domestic industry might have, in resort to the Con-

gress or to the Tariff Commission. We do not undertake to predict the answer.

It follows that the Customs Court erred in holding that it had jurisdiction of this case. Its decision and judgment are reversed.

Reversed.

ALMOND, Judge, dissenting, with whom BALDWIN, Judge, joins.

With deference, I am unable to agree with the conclusion of the majority that the Customs Court lacked jurisdiction in the present matter. I would not only affirm the decision of the court below on the jurisdiction issue but also on the merits of the controversy.

Section 516(b), unambiguous in its terms, confers permission on an American manufacturer, producer, or wholesaler to protest a decision of the Secretary of the Treasury as to the classification or rate of duty imposed upon imported merchandise of a class or kind manufactured, produced or sold at wholesale by him. Therefore, if the present protest involves either the classification of the imported merchandise or the rate of duty with respect thereto, the Customs Court was invested with jurisdiction to entertain the instant action.

I think it clear that the protest in issue was directed towards the classification and/or rate of duty as those terms are employed in section 516(b). These statutory terms were defined in Bradford Co. v. American Lithographic Co., 12 Ct.Cust.Appls. 318, T.D. 40318 (1924), where an American manufacturer, pursuant to section 516(b) of the Tariff Act of 1922, protested the failure of the Secretary of the Treasury to impose an additional duty equal to ten percent of the appraised value of the article because the merchandise was not marked, branded or labeled so as to indicate the country of origin as required by section 304 (a), Tariff Act of 1922, predecessor of section 304(a), Tariff Act of 1930.[1] The

appeals court affirmed the holding of the Board of General Appraisers that:

> · * * * the determination by the collector that the merchandise was, or was not, lawfully marked, as required by section 304(a), supra, involved classification of the merchandise, and that the additional duty of 10 per cent of the appraised value of merchandise classified as not legally marked, provided for in section 304(a), is a rate of duty within the meaning of the provisions of section 516(b) of the act of 1922, granting to an American manufacturer, producer, or wholesaler, of the class or kind of the imported merchandise, the right to protest the classification of merchandise and the rate of duty assessed by the collector * *. [12 Ct.Cust.Appls. at 320–321.]

The appellant in Bradford contended that the provisions of section 304(a) do not involve classification of merchandise and an assessment of a rate of duty, and therefore the right extended to an American manufacturer by section 516 (b) did not apply, and, accordingly, the Board of General Appraisers was without jurisdiction. The appellate court, however, stated:

> Classification of imported merchandise is the process or act of grouping, or arranging merchandise into classes; it is a process which may be based upon the use to which the article has been dedicated, its commercial designation, its similarity to other merchandise, the condition in which it is imported, and other equally important considerations, the purpose of which is to determine what provisions of the tariff laws are applicable thereto.

As stated, classification is the process of determining "what provisions of the tariff law are applicable" to the importation. Assimilating Bradford to the instant situation, I think it clear that in both the American manufacturer was

---

1. As far as the issue here is concerned, section 516(b) of the Tariff Act of 1922 was essentially the same as section 516(b) of the Tariff Act of 1930.

protesting the failure of the Secretary of the Treasury to apply the provisions of the statute and, thus, in each instance the "classification" of the imported merchandise was involved. In *Bradford,* the complaint involved improper marking under section 304(a) resulting in failure to impose the additional duty demanded for improperly marked goods. Here, appellee's complaint is directed at the failure of the Secretary of the Treasury to find that the litharge was the recipient of a bounty or grant under section 303, Tariff Act of 1930. Both in *Bradford* and here the seeking of judicial review was predicated on the finding of the Secretary that the relevant imported merchandise was not within a particular provision of the tariff laws which called for imposition of additional duties.

It is also my opinion that the additional duty prescribed by section 303, equal "to the net amount of such bounty or grant," is a rate of duty envisioned within the meaning of section 516(b). In *Bradford,* which, as has been seen, relates to additional duty of 10 percent of the appraised value of goods improperly marked under section 304(a), the appeals court stated:

> It is a rate of duty to be levied upon such merchandise as is classified by the collector as not marked in conformity with the mandate of the law.

> \*   \*   \*   \*   \*   \*

> We think that a proper interpretation of the phrase, "rate of duty," as it is used in section 516(b), supra, means the amount of duty assessed against imported merchandise, resulting in the first instance, from the classification thereof. No other fair conclusion can be reached, we think, without a strained interpretation of the provisions of the section, expressive of the legislative intent as it plainly appears therein, that is, to extend to the American manufacturer, producer, or wholesaler the right to protest a classification of imported merchandise of a class and kind manufactured, produced, or sold at wholesale by him, and the rate of duty assessed thereon, if

in his opinion such classification is wrong and the rate of duty assessed improper, because of his interest and concern in preventing unlawful competition in the markets of the United States by foreign producers of foreign products, resulting in injury to his business.

I am not persuaded of error in the decision of the Customs Court on the jurisdictional issue and would conclude with it that:

> *Bradford* \* \* \* is determinative of the jurisdictional issue here. Section 303, like section 304, requires the imposition of an added duty, added upon the existing statutory duty, should a specific condition exist. In section 304, this condition is the failure to properly mark the imported goods with the country of origin; in section 303 this condition includes the bestowal of a bounty or grant by a foreign government. One teaching of *Bradford* is that the determination by the Secretary of the existence of such a condition is "classification" within the meaning of section 516(b).

> \* \* \* In short, just as the additional duty of 10 percent of the appraised value of merchandise classified as not legally marked, as required by section 304(a), is a "rate of duty" within the meaning of section 516(b), so an additional duty equal to the net amount of a bounty or grant, as required by section 303, is a "rate of duty" within the meaning of section 516(b). Thus, the "rate of duty" within the meaning of section 516(b) is not delimited to the statutory duty being assessed on the imported merchandise; rather, the imposition of an additional duty under section 303 is as much a statutory duty as the 1.25 cents per pound contained in item 473.52 of the tariff schedules. This is to say that if the existence of a bounty or grant is shown, then the mandate to levy the appropriate countervailing duty possesses the same statutory sanctity as the requirement of impos-

ing 1.25 cents per pound under item 473.52.

The majority attempts to distinguish *Bradford* "on the hypothesis that the ten percent marking duty there involved was not regarded as penal." I see no such distinction between the provisions of section 304 (the one involved in *Bradford*) and section 303 (the one involved here). They are either both "penal" or not, and I do not see how one could be found "penal" and the other one found "not penal." Nor do I think that a distinction can be drawn from the fact that the "duty under section 304 for not marking relates to a physical characteristic of the merchandise, observable on its examination by Customs officers." Whether the particular statutory provision involved relates to the physical examination of the merchandise or not has nothing to do with whether said statutory provision is concerned with the determination of the "classification" or "rate of duty."

It seems clear to me that the majority has in effect concluded that the decision in *Bradford* was wrong. I cannot agree with the reasoning expressed by the majority in reaching such a conclusion and in limiting the applicability of section 516(b). The limitations imposed by the majority are, in my opinion, contrary to the decision in *Bradford* and to the explicit meaning of 516(b). The majority opinion suggests that American manufacturers should not bypass the U. S. Treasury by invoking 516(b) procedure, as distinguished from the procedure of section 514. I do not see how it can be said that the Executive branch is being bypassed in either case. If an importer may protest the decision of the Secretary of the Treasury finding a bounty or grant, why shouldn't an American manufacturer be permitted to protest the decision of the Secretary of the Treasury finding no bounty or grant? In neither case are the protesting parties bypassing the U. S. Treasury. They are merely protesting a decision of the Secretary of the Treasury as they are clearly permitted to do under either section 514 or 516, depending on whether it is a protest by an importer or by an American manufacturer. Nor do I think that the slight language differences between sections 514 and 516 support the majority reasoning in this regard. We have previously held that "an American manufacturer, upon compliance with the provisions of * * * section 516(b), might protest the rate of duty assessed against importations to the same extent, so far as judicial review is concerned, as an importer might do under the provisions of section 514, providing for protests by importers against decisions of the collector." Feltex Corp. v. Dutchess Hat Works, 21 CCPA 463, 472, T.D. 46957 (1934). To me section 516(b) is clear in conferring jurisdiction upon the Customs Court in the instant matter.

Having concluded that the Customs Court had jurisdiction, I would also affirm that court's decision on the merits of the controversy. I think the Customs Court was correct in finding a bounty or grant from the facts adduced in the present case. In fact, I am persuaded that such a conclusion is impelled by the definitions of bounty and grant expounded by the Supreme Court in Nicholas & Co. v. United States, 249 U.S. 34, 39 S.Ct. 218, 63 L.Ed. 461 (1919), aff'g 7 Ct.Cust.Appls. 97, T.D. 36426 (1916), and Downs v. United States, 187 U.S. 496, 23 S.Ct. 222, 47 L. Ed. 275 (1903), aff'g 113 F. 144 (4th Cir. 1902) and by the facts involved in those cases. Since the majority found it unnecessary to discuss the issue on the merits because of its disposition of the jurisdiction issue, I likewise feel no need to consider it further except to add that the Customs Court's findings in that regard are supported by substantial evidence and are not clearly contrary to the weight of the evidence. Suffice it to say that I think there is persuasive legal precedent requiring an affirmance of the decision of the Customs Court as to both jurisdiction and the merits. I would, therefore, affirm.