ASG INDUSTRIES, INC., PPG Indus-
tries, Inc., Libbey-Owens-Ford
Company, and C E Glass

v.

UNITED STATES.

C.D. 4782;  Court No. 76–3–00667.

United States Customs Court.

Jan. 5, 1979.

· Stewart & Ikenson, Washington, D. C. (Eugene L. Stewart and Frederick L. Ikenson, Washington, D. C., of counsel), for plaintiffs.

Barbara Allen Babcock, Asst. Atty. Gen., Washington, D. C., David M. Cohen, Chief, Customs Section, New York City, Joseph I. Liebman, John J. Mahon and Sidney N. Weiss, Trial Attys., New York City, for defendant.

FORD, Judge:

This action involves cross-motions for summary judgment filed pursuant to rules 4.12 and 8.2 of the rules of this court. Plaintiffs, domestic manufacturers and wholesalers of float glass, allege certain bounties or grants were being paid or bestowed upon the manufacture of float glass in the Federal Republic of Germany. Plaintiffs urge such importations of float glass are, therefore, subject to assessment of countervailing duties as provided for in section 303(a) of the Tariff Act of 1930, as amended by section 331(a) of the Trade Act of 1974, 88 Stat. 1978, 2049. Defendant contends plaintiffs have failed to establish that the alleged bounties or grants possess the requisite effect upon international trade which would require imposition of countervailing duties.

The essential facts relating to assistance given the two glass manufacturers in the Federal Republic of Germany are not in dispute, nor is the chronology leading to the final determination of the Secretary of the Treasury (Secretary) in finding that such assistance did not amount to a bounty or grant within the meaning of section 303(a), as amended, *supra.*

The statements of material facts filed by the parties pursuant to rule 8.2(b) of the rules of this court, and upon which the parties contend there is no triable issue, establish that plaintiffs are domestic manufacturers and wholesalers of float glass. On June 3, 1974, plaintiffs filed a petition with the Commissioner of Customs alleging bounties or grants were being paid to manufacturers of float glass in the Federal Republic of Germany. A "Notice of Receipt of Countervailing Duty Petition" was published in the Federal Register, 40 Fed.Reg. 2718, on January 15, 1975. As a result of the petition, an administrative investigation was conducted by the Department of Treasury with the assistance of the United States Customs Service pursuant to section 303(a), *supra,* and 19 C.F.R. § 159.47(c) (1975) in order to make a preliminary and final determination. On June 30, 1975, a "Notice of Preliminary Countervailing Duty Determination" was published in the Federal Register, 40. Fed.Reg. 27499, as follows:

On the basis of an investigation conducted pursuant to § 159.47(c) Customs Regulations (19 CFR 159.47(c)), it has tentatively been determined that benefits have been received under various West German Federal and State Government regional development programs. Government aid to these regional areas consists of investment grant subsidies and bonuses for capital expenditures relating to construction or expansion of plants, low interest loans, and special railway tariff rates.

Benefits derived from programs such as those which are the subject of this investigation can, in some circumstances, constitute bounties or grants within the meaning of the law. Since the information thus far made available concerning these programs has not been sufficient to permit a thorough analysis of their nature and effect, it has been determined preliminarily that imports of float glass from West Germany benefit from the payment or bestowal of a bounty or grant, directly or indirectly, within the meaning of the [sic] section 303 of the

Tariff Act of 1930, as amended, by reason of the regional incentive payments mentioned above.

An amendment to "Notice of Preliminary Countervailing Duty Determination" was published in the Federal Register, 40 Fed. Reg. 34423, on August 15, 1975 extending the time within which the public could make submissions. On January 7, 1976, a "Notice of Final Countervailing Duty Determination" was published in the Federal Register, 41 Fed.Reg. 1300, and provides:

Information has now been received that permits a more complete analysis of the alleged bounties and grants. Under various regional development programs administered by the Federal and State Governments, low interest loans and investment subsidies in the form of cash grants and tax credits have been given to producers of float glass. The German Government has advised the Treasury Department that these benefits have the effect of offsetting disadvantages which would discourage industry from moving to and expanding in less prosperous regions. Inasmuch as the recipient glass producers sell a preponderance of their production in the West German home market (not less than 80 percent and up to 99%), the level of exports to the United States is a small percentage of the amount exported, and the amount of assistance provided by the regional incentive programs is less than 2 percent of the value of float glass produced, these benefits are not regarded as bounties or grants within the meaning of section 303 of the Tariff Act of 1930, as amended (19 U.S.C. 1303). All other allegations alleged in the petition are found not to be applicable to the manufacturer, producer or exporter.

Accordingly, for the reasons stated above, it is hereby determined that no bounty or grant is being paid or bestowed, directly or indirectly, within the meaning of section 303, Tariff Act of 1930, as amended (19 U.S.C. 1303), upon the manufacture, production, or exportation of float glass from West Germany.

On January 28, 1976, plaintiffs, pursuant to section 516(d) of the Tariff Act of 1930, as amended by section 321(f)(1), filed a timely notice of their desire to contest the negative countervailing duty determination by the Secretary. The Secretary then caused publication of plaintiffs' notice in the Federal Register of March 10, 1976, 41 Fed.Reg. 10236 (1976). Plaintiffs, on March 15, 1976, commenced action by the filing of a summons with this court.

The facts relating to the two producers of float glass in the Federal Republic of Germany and the assistance given by the federal and state governments in Germany establish that Vereinigte Glaswerke GMBH (Vereinigte) and Flachglas/Delog/Detal (Flachglas) are the two manufacturers of float glass in West Germany. In January 1971 Vereinigte completed construction of a float glass facility at Herzogenrath, West Germany, which is in the state of North Rhine-Westphalia, and Flachglas completed construction of its facility in Gladbeck, which is also in the state of North Rhine-Westphalia in 1973. The state of North Rhine-Westphalia was in an area qualifying for certain federal and state regional development assistance programs. Section 32 of the Coal Mining Adjustment Law of Germany permits eligible firms to apply for an investment premium of 10% of the production cost for plants established between April 30, 1967 and December 31, 1971, or for plants whose construction had been started before January 1, 1973. This investment premium was in the form of a tax credit which could have been utilized to the extent that the deduction exceeded the tax payable in the year of construction. However, it could have been carried forward against such taxes payable for the succeeding four fiscal years after which any remaining tax credits were lost. These tax credits amounted to 10% of the depreciable assets as defined by law and were granted to Vereinigte in 1973 and retroactively applied to the 1970 and 1971 corporate taxes. Flachlgas also received a credit of 10% of the depreciable assets as defined by law.

In addition to the above, the state of North Rhine-Westphalia provided taxable assistance from funds of the federal and state governments for the improvement of regional economic structures in economically weak regions. Vereinigte, on January 30, 1970, was provided with investment assistance which was utilized to partially finance the cost of its Herzogenrath facility. Flachglas also received said assistance in December 1972 and December 1973, which was used to partially finance the cost of its Gladbeck facility.

Under the European Recovery Program eligible enterprises could obtain loans at the interest rate of 6% per annum for a period from July 21, 1967 to the end of 1971. Vereinigte received a 12-year loan at the rate of 6% in 1970, the first two years free of redemption. The available commercial interest rate for similar issues was 8.5% per annum. Flachglas also received a 10-year loan at 6% interest in 1972, the first 18 months being free of redemption.

In 1970, the Federal Department of Labor of West Germany granted Vereinigte a 12-year loan with interest payable at the rate of 4% per annum, with the first two years free of redemption.

Vereinigte and Flachglas sold a preponderance of their production in the West German home market (not less than 80% and up to 99%). The amount of assistance provided by the regional incentive programs was less than 2% of the value of the float glass produced.

As indicated *infra*, float glass may be classified under nine items of the Tariff Schedules of the United States. The *Summaries of Trade and Tariff Information*, Schedule 5, Volume 5, TC Publication 365 (1971), contain the following pertinent information:

> Ordinary glass is defined as flat glass other than special or colored glass and is usually clear or nearly clear glass whose coloring or opacifying content is so low that light transmittance is virtually unhindered.

> Plate glass and float glass are types of flat glass that have plane and parallel surfaces and show no distortion when objects are viewed through them. The two types of glass are virtually indistinguishable, differing principally in method of manufacture and cost of production. They are used interchangeably in most applications although float glass is not produced as yet in all the thicknesses in which plate glass is made.

> Plate glass is manufactured principally by using the rolled glass process that turns out a continuous ribbon of flat glass of the desired thickness and width. The sheet of glass, after passing through an annealing lehr to remove internal stresses, is cut to standard sizes before being subjected to grinding and polishing operations. In the finishing process, the surfaces of the plate glass are ground by machine to a very smooth flat surface, which is then polished by buffing. The plate glass may be ground or polished on one side at a time or on both sides simultaneously. In the process of grinding and polishing, the plate glass acquires perfectly plane and parallel surfaces.

> Float glass is a relatively new type of flat glass [1] (available commercially since

---

[1] The float-glass process is patented, and U.S. producers of float glass are licensed by the British firm that invented the process.

> 1959) which has virtually parallel surfaces similar to those of plate glass. The parallel surfaces of float glass, however, are achieved by floating the molten glass over molten metal rather than by grinding and polishing as is done with plate glass. Float glass is less costly to produce than plate glass principally because the float process does not require grinding and polishing operations.

\* \* \* \* \* \*

> Nearly all of the plate and float glass shipped by U.S. producers has consisted of glass ranging in thickness from ⅛ inch to ¼ inch inclusive. In terms of square feet, considerably more than half of both the plate glass and the float glass shipped by U.S. producers in 1968 was ⅛ inch glass. \* \* \*

*U.S. Industrial Outlook 1978* published by the United States Department of Commerce under the heading "Flat Glass" (p. 23) indicates the replacement of plate glass by float glass and makes the following statement:

> The major products of the industry are float glass, tempered glass, and laminated glass. Tempered and laminated glasses are float glass that has received additional processing. Plate and sheet glass are made in small quantities, and have been replaced for all practical purposes by float glass. * * * [*See also U.S. Industrial Outlook 1977.*]

It is further noted that *Modern Glass Practice* by Samuel R. Scholes, Ph.D. (7th rev. ed. 1975), p. 240, states float glass "is replacing conventional plate glass because of the greater economy of its manufacture."

The pertinent statutory provisions herein provide as follows:

Section 303(a), Tariff Act of 1930, as amended by section 331(a) of the Trade Act of 1974, 88 Stat. 1978, 2049–50:

> (a) Levy of countervailing duties—(1) Whenever any country, dependency, colony, province, or other political subdivision of government, person, partnership, association, cartel, or corporation, shall pay or bestow, directly or indirectly, any bounty or grant upon the manufacture of production or export of any article or merchandise manufactured or produced in such country, dependency, colony, province, or other political subdivision of government, then upon the importation of such article or merchandise into the United States, whether the same shall be imported directly from the country of production or otherwise, and whether such article or merchandise is imported in the same condition as when exported from the country of production or has been changed in condition by remanufacture or otherwise, there shall be levied and paid, in all such cases, in addition to any duties otherwise imposed, a duty equal to the net amount of such bounty or grant, however the same be paid or bestowed.

> * * * * * *

> (5) The Secretary shall from time to time ascertain and determine, or estimate, the net amount of each such bounty or grant, and shall declare the net amount so determined or estimated.

> * * * * * *

Section 516(d), Tariff Act of 1930, as amended by section 321(f)(1) of the Trade Act of 1974, 88 Stat. 1978, 2048–49:

> (d) Within 30 days after a determination by the Secretary—

> (1) under section 201 of the Antidumping Act, 1921 (19 U.S.C. 160), that a class or kind of foreign merchandise is not being, nor likely to be, sold in the United States at less than its fair value, or

> (2) under section 303 of this Act that a bounty or grant is not being paid or bestowed,

an American manufacturer, producer, or wholesaler of merchandise of the same class or kind as that described in such determination may file with the Secretary a written notice of a desire to contest such determination. Upon receipt of such notice the Secretary shall cause publication to be made thereof and of such manufacturer's, producer's, or wholesaler's desire to contest the determination. Within 30 days after such publication, such manufacturer, producer, or wholesaler may commence an action in the United States Customs Court contesting such determination.

> * * * * * *

> (g) If the cause of the action is sustained in whole or in part by a decision of the United States Customs Court or of the United States Court of Customs and Patent Appeals, merchandise of the character covered by the published decision of the Secretary, which is entered for consumption or withdrawn from warehouse for consumption after the date of publication of the court decision, shall be subject to appraisement, classification, and as-

sessment of duty in accordance with the final judicial decision in the action, and the liquidation of entries covering the merchandise so entered or withdrawn shall be suspended until final disposition is made of the action, whereupon the entries shall be liquidated, or if necessary, reliquidated in accordance with the final decision.

Based upon the foregoing, it would appear that bounties or grants were bestowed on the production of float glass in the Federal Republic of Germany. Accordingly, the threshold issue for determination is whether the importations are subject to countervailing duties under the statute.

■ The statutory provision of section 303(a)(1) requiring the assessment of such duties in using the language "there shall be levied and paid, in all such cases, in addition to any duties otherwise imposed, a duty equal to the net amount of such bounty or grant" is couched in mandatory language. However, if Congress intended that all assistance given by foreign governments are bounties or grants, there would be no reason to have given the Secretary authority to make a determination of whether a bounty or a grant had been bestowed. This is clearly evidenced by the following language utilized in *United States (Ralph Valls, Party-in-Interest) v. Hammond Lead Products, Inc.*, 440 F.2d 1024, 58 CCPA 129, C.A.D. 1017 (1971), *cert. denied*, 404 U.S. 1005, 92 S.Ct. 565, 30 L.Ed.2d 558 (1971):

The Congress is, of course, well aware of these problems, and it would seem it elects to rely on executive descretion to avoid making the United States ridiculous by penalizing imports from foreign countries which have taken reasonable action, action our own government takes or counsels. Countervailing duties are strong medicine, well calculated to arouse violent resentment in countries whose trade practices are branded by the court as unethical. In what has been hitherto the regular practice of the Treasury Department making the decision to assess countervailing duties, the decisions, not necessarily partisan political, but political

in a broad sense, legislative, or of a policy nature, can be made by an agency that is equipped and staffed to make them. There can be no doubt that the Secretary is under a legal duty to assess countervailing duties if he sees a bounty or grant being paid, but we think he does and must exercise some discretion in defining what acts of foreign governments confer bounties or grants, when the case is doubtful. * * *

■ It is the function of the courts in interpreting statutory provisions to carry out the intent of Congress in enacting the law. In order to ascertain intent courts may resort to legislative history. *Train v. Colorado Public Interest Research Group*, 426 U.S. 1, 96 S.Ct. 1938, 48 L.Ed.2d 434 (1976); *A. N. Deringer, Inc. v. United States*, 63 CCPA 37, C.A.D. 1161 (1975). Chief Judge Markey, speaking for the court in *United States v. Zenith Radio Corporation*, 64 CCPA 130, C.A.D. 1195 (1977), made the following appropriate comment:

The intent of Congress, as expressed in § 303 itself, is not difficult to fathom. As the predecessor of this court, in *Nicholas & Co. v. United States*, 7 Ct.Cust. Appls. 97, T.D. 36426 (1916), and the Supreme Court in *Nicholas*, 249 U.S. [34] at 39 [39 S.Ct. 218, 63 L.Ed. 461], indicated, the words "bounty" and "grant" are broad but not ambiguous. "Net amount" necessarily means that countervailing duties should equate to the true bounty or grant actually conferred. Congress' intent to provide a wide latitude, within which the Secretary of the Treasury (Secretary) may determine the existence or non-existence of a bounty or a grant, is clear from the statute itself, and from the Congressional refusal to define the word "bounty" * * *.

* * * * * * .*

Not without reason has Congress refrained from spelling out either the precise criteria for determining what shall constitute a bounty or grant and what shall not, or the calculations to be followed in determining net amount. As this court said in *Hammond Lead*, supra

note 11: "In the assessment of a countervailing duty, the determination that a bounty or grant is paid necessarily involves judgments in the political, legislative or policy spheres," 58 CCPA at 137, 440 F.2d at 1030, to which the court might well have added the eminently important economic sphere. Our nation's relationships in the world family are particularly sensitive to the assessment of the additional duties known as "countervailing" duties. Such assessment is not just a means of protecting our producers, as Congress has recognized in refusing to require proof of injury before making such assessment; it is also one of the chips in a game played by governments on a world stage. Presumably enacting and reenacting § 303 in this broad light, illuminative of the statute's role in the world, Congress in its wisdom has simply refrained from calling all the countervailing duty plays in advance.[15]

[15] Congress' most recent reference to the international implications of export incentives and countervailing duties, and to the role of the Executive in connection herewith, appears in § 331(a), Trade Act of 1974, 19 U.S.C. 1303(d)(1) (Supp. V. 1975):

It is the sense of the Congress that the President, to the extent practicable and consistent with United States interests, seek through negotiations the establishment of internationally agreed rules and procedures governing the use of subsidies (and other export incentives) and the application of countervailing duties.

To facilitate negotiations, Congress, while continuing to refrain from a definition of "bounty" or "grant," granted authority to the Secretary to suspend during the four years beginning January 3, 1975, and under certain conditions, the imposition of countervailing duties, after having determined that a bounty or grant is in fact being bestowed, 19 USC 1303(d)(2), and to reinstate such duties, 19 USC 1303(d)(3). In § 1303(e), Congress provided for reports to it of actions under § 1303(d)(2), and for the undoing thereof upon a resolution of disapproval by the Senate or the House.

In *Zenith Radio Corporation v. United States,* 437 U.S. 443, 98 S.Ct. 2441, 57 L.Ed.2d 337 (1978), the Supreme Court, in considering what constitutes a bounty or a grant, referred to Senate Report No. 93–1298, p. 183 (1974), which so far as is pertinent herein, made the following comment:

"The Committee recognizes that the issues involved in applying the countervailing duty law are complex, and that, internationally, there is the lack of any satisfactory agreement on what constitutes a fair, as opposed to an "unfair," subsidy. In the long run, United States interests will be best served by an international agreement to eliminate subsidies which *distort world trade patterns and discriminate against United States sales both at home and abroad.* Central to the forthcoming multilateral negotiations should be the establishment of acceptable international rules governing the use of subsidies. This is particularly important because of the strong possibility that oil importing nations will be tempted to subsidize their manufactured goods exports in order to pay for their "oil deficits." [Emphasis supplied.]

With respect to unfair competitive advantage, the Supreme Court in *Zenith* stated:

* * * This purpose is relatively clear from the face of the statute and is confirmed by the congressional debates: the countervailing duty was intended to offset the unfair competitive advantage that foreign producers would otherwise enjoy from export subsidies paid by their governments. See, *e. g.,* 30 Cong.Rec. at 1674 (remarks of Sen. Allison), 2205 (Sen. Caffery), 2225 (Sen. Lindsay). The Treasury Department was well-positioned to establish rules of decision that would accurately carry out this purpose, particularly since it had contributed the very figures relied upon by Congress in enacting the statute. See *Zuber v. Allen,* 396 U.S. 168, 192, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969).

In view of the foregoing, it is apparent Congress was aware of the complexities involved not only in determining or defining a bounty or grant, but whether such bounty or grant is fair or unfair.

■ The test enunciated in *Downs v. United States,* 187 U.S. 496, 23 S.Ct. 222, 47 L.Ed. 275 (1903) and *Nicholas & Co. v. United States,* 249 U.S. 34, 39 S.Ct. 218, 63 L.Ed. 461 (1919) is whether, as a result of governmental programs, exportation of the merchandise so produced is encouraged. The fact that governmental assistance was given to aid depressed areas in the Federal Republic of Germany is therefore of no consequence.

■ Whether as a result of bounties or grants, exportation was encouraged to the extent it would distort foreign trade, it is to be noted in the statement of material facts filed pursuant to rule 8.2(b) of the rules of this court, and particularly the "Notice of Final Countervailing Duty Determination," that no less than 80% and up to 99% of the production was sold in West Germany. The statement further indicates that the assistance was less than 2% of the value of float glass produced in the Federal Republic of Germany. While up to 20% of the production and 2% of the value may be more than *de minimus,* the bounties do not appear to have induced the sale of such merchandise in such quantities or value as would tend to distort international trade. The Secretary has in effect made such a finding in holding countervailing duties were not applicable herein. Such a finding is presumptively correct. Compatible with the finding by the Secretary that governmental assistance given the float glass manufacturers in West Germany did not distort international trade, the court notes the United States Department of Commerce, Bureau of the Census figures [1] indicate that exports of float glass by the United States from 1972 to 1975 rose from 59 million square feet to 103 million square feet. The court has utilized the years 1972 to 1975 in view of the fact that plaintiffs in their pretrial discovery proceedings sought, by way of written interrogatories, certain information concerning production, etc. for these years. The discovery was the subject of a motion to compel by plaintiffs and a motion for a protective order by defendant, both of which were granted as to certain information. Of significant interest are the figures from the same source which establish that exports of float glass to West Germany increased from 409,000 square feet in 1972 to 979,000 square feet in 1975. These substantially increased sales in the home market of a country which provided bounties or grants are indicative that there has been no discrimination in sales made by the United States to West Germany. It follows that United States sales were therefore competitive in the home markets of West Germany. What better proof can be adduced that float glass produced in the Federal Republic of Germany under a bounty or grant system did not tend to distort international trade or discriminate against United States sales for home consumption or export.

The import statistics of the United States Department of Commerce, Bureau of the Census,[2] are arranged according to the provisions of the Tariff Schedules of the United States since the information is obtained from the entries of merchandise utilizing the TSUS number plus the statistical suffix. There are nine provisions [3] under which float glass, plate glass and colored or special glass may be entered. The court is not privy to the size or type of float glass covered by this action and hence has reviewed the entire nine categories (excluding glass with wire) of possible classification under the Tariff Schedules of the United States. It is to be noted, however, that the 1972 import statistics establish imports from West Germany in all nine categories. While the figures may include categories of glass not intended to be encompassed within this action, the statistical information is nevertheless enlightening. Imports of glass

1. U.S. Bureau of the Census, U.S. Exports, Schedule B Commodity by Country—Domestic Merchandise, Report FT 410: item # 6644040 for the years 1972–1975.

2. U.S. Bureau of the Census, U.S. Imports for Consumption, TSUSA Commodity by Country of Origin, Report FT 246 for the years 1972–1975.

3. Tariff Schedules of the United States, item numbers including statistical suffix: 543.2100, 543.2300, 543.2730, 543.2770, 543.3100, 543.-6100, 543.6300, 543.6700, 543.6900.

from all countries in these nine item numbers decreased from 72 million square feet in 1972 to 19 million square feet in 1975. Imports in these categories from West Germany fell from 3,900,000 square feet in 1972 to 518,000 square feet in 1975.

According to the United States Department of Commerce, Bureau of the Census,[4] the domestic production covering float and plate glass not over ⅛″ in thickness and over ⅛″ but not over ¼″ in thickness establishes a marked increase. Production rose from 1 billion 424 million square feet in 1972 to 1 billion 920 million square feet in 1975.

The above figures covering exports, imports, and domestic production, while they may not be determinative, are indeed supportive of the Secretary's finding. It is a well established principle of law which needs no citation that courts may take judicial notice of official publication.

Congress in enacting the countervailing duty statute was primarily interested in merchandise produced under a bounty or grant system which was imported into the United States and the possible effect it might have on domestic producers of the merchandise involved in both domestic and foreign sales. Absent are figures involving production, consumption, importation and exportation of float glass of every producing nation. However, the 1972–1975 figures cited *supra* support a finding that float glass produced in the Federal Republic of Germany did not tend to distort international trade and did not discriminate against the United States production and sales, both domestic and foreign.

Based upon the record, plaintiffs have failed to overcome the presumption of correctness attaching to the action of the Secretary.

In view of this finding, the court deems it unnecessary to consider the alternative positions of the parties.

Plaintiffs' motion for summary judgment is, therefore, denied and defendant's cross-motion for summary judgment is granted.

Judgment will be entered accordingly.

---

4. Current Industrial Reports MQ–32A for the years 1972–1975: items designated 3211213 and 3211215.